**UNITED STATES of America,
Appellee,**

v.

**Jose DIAZ, also known as Jolly; Jesse Rodriguez, also known as J-1, also known as Jesse M. Rodriguez; Jose Rodriguez, also known as Baby Latin, also known as Rambo; Julio Vasquez; Jose Melendez, also known as Little; Dennis Millet, also known as Denise**

Mikan; Carlos M. Rodriguez, also known as Jesus; Edgardo Ortiz, also known as Eddie, also known as Mad Dog, also known as Cougar; Gregg Cyr, Jr.; Richard Soto, also known as Blizz; Isolina DeJesus; Luis Rodriguez; Sara Lee Medina; Ishmael Cancel, also known as Cano; Eliesel Llorens, also known as Alex, also known as Junior; Jose A. Lugo; Antonio Martinez, also known as Jibaro; Marcus Lnu; Christopher Barnes; Beatrice Codianni, also known as Beatrice Robles, also known as Beatrice Ferraro, Defendants,

**Nelson Luis Millet; Manuel E. Roman, also known as Manny, also known as Pito; Richard Morales, also known as Richie, also known as Orco; Hector Luis Rios, also known as Crazy Louie; Maria Vidro, also known as China; Johnny Zapata; Robert Burgos, also known as Rob Dog; Francisco Soto, also known as Frankie; Antonio Rivera, Jr., also known as Broken Back Tony \*; Alexis Antuna, also known as Alex; Luis Noel Cruz, also known as Noel; Edgar Rodriguez, also known as Eggy; Edward Calderon, also known as Choco; Gilberto Rivera, also known as Junco, Defendants–Appellants.**

Docket Nos. 96–1011(L), 96–1025, 96–1051, 96–1055, 96–1073, 96–1085, 96–1086, 96–1087, 96–1088, 96–1089, 96–1297\*, 96–1495, 96–1633, 96–1803, 97–1661.

United States Court of Appeals,
Second Circuit.

Argued Sept. 28, 1998.

Decided May 4, 1999.

---

\* Appeal has been withdrawn.

56

Joseph W. Martini, Special Assistant United States Attorney, Pepe & Hazard LLP, Southport, CT, and Theodore B. Heinrich, Assistant United States Attorney, District of Massachusetts, Boston, MA (John H. Durham, Deputy United States Attorney, District of Connecticut, New Haven, CT, on the brief, Stephen C. Robinson, United States Attorney, District of Connecticut, New Haven, CT, Stephen V. Manning, Assistant United States At-

torney, District of Connecticut, Hartford, CT, both on a letter brief), for Appellee.

Jeremiah Donovan, Old Saybrook, CT, for Defendant–Appellant Nelson Luis Millet.

William T. Koch, Jr., Lyme, CT, for Defendant–Appellant Manuel E. Roman.

James J. Ruane, Gaston & Ruane, Bridgeport, CT, for Defendant–Appellant Richard Morales.

Bruce D. Koffsky, Stamford, CT, for Defendant–Appellant Hector Luis Rios.

Gerald E. Bodell, New York, NY, for Defendant–Appellant Maria Vidro.

Erskine D. McIntosh, The Law Offices of Erskine D. McIntosh, P.C., New Haven, CT, for Defendant–Appellant Johnny Zapata.

Aaron P. Buda, Schad, Buda, Lucia & Cook, Cincinnati, OH (Kevin M. Schad, on the brief), for Defendant–Appellant Robert Burgos.

David E. Liebman, New York, NY, for Defendant–Appellant Francisco Soto.

John M. Andreini, Dubay & Andreini, Hartford, CT, on the brief, for Defendant–Appellant Antonio Rivera, Jr. (Appeal has been withdrawn).

Colleen P. Cassidy, The Legal Aid Society, Federal Defender Division, New York, NY, for Defendant–Appellant Luis Noel Cruz.

Howard R. Birnbach, Great Neck, N.Y. (Joseph J. Colarusso, Colarusso & Napolitano, Stamford, CT, on the brief), for Defendant–Appellant Edgar Rodriguez.

Eileen McGann, Law Office of Eileen McGann, Esq., West Redding, CT, for Defendant–Appellant Edward Calderon.

Earle Giovanniello, Gorman & Enright, P.C., New Haven, CT, for Defendant–Appellant Gilberto Rivera.

John T. Walkley, Trumbull, CT, for Defendant–Appellant Alexis Antuna.

Before: CALABRESI, STRAUB, Circuit Judges, and TSOUCALAS, Judge.**

TSOUCALAS, Judge:

Defendants-appellants Nelson Luis Millet, Manuel E. Roman, Richard Morales, Hector Luis Rios, Maria Vidro, Johnny Zapata, Robert Burgos, Francisco Soto ("F.Soto"), Alexis Antuna, Luis Noel Cruz, Edgar Rodriguez ("E.Rodriguez"), Edward Calderon and Gilberto Rivera ("G.Rivera"), appeal from judgments entered, following jury trials or plea agreements, in the United States District Court for the District of Connecticut (Alan H. Nevas, *Judge* ), convicting and sentencing them for crimes in connection with their participation in a racketeering enterprise engaged in the distribution of narcotics.

Nine defendants-appellants, excluding Burgos, Calderon, G. Rivera and E. Rodriguez, were convicted under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1988), for conducting the affairs of an enterprise through a pattern of racketeering activity, and under 18 U.S.C. § 1962(d) (1988) for racketeering conspiracy. Most defendants-appellants were convicted under 18 U.S.C. § 1959(a)(1)-(3), (5), (6) (1988) for aiding and abetting, conspiring to commit or committing murders or other violent crimes in aid of racketeering ("VICAR"): Antuna (three counts), Burgos (one count), Cruz (three counts), Morales (eight counts), Rios (one count), Roman (four counts), F. Soto (four counts), Vidro (six counts) and Zapata (six counts). All defendants-appellants except for Burgos were convicted under 21 U.S.C. §§ 841(a)(1), 846 (1988) for conspiracy to distribute and to possess with intent to distribute heroin, marijuana, cocaine and

** The Honorable Nicholas Tsoucalas, Senior Judge of the United States Court of International Trade, sitting by designation.

cocaine base, and Morales was convicted under 21 U.S.C. § 841(a)(1), (b)(1)(A) (1988) for one count of possession with intent to distribute 50 or more grams of cocaine base. In addition, Burgos was convicted under 21 U.S.C. § 843(b) (1988) for one count of using a telephone in facilitating a drug transaction, Calderon was convicted under 18 U.S.C. § 922(n) (1988) for one count of receiving a firearm while under a felony indictment, and Roman was convicted under 18 U.S.C. §§ 922(g)(1), 924(a)(2) (1988) for one count of firearm possession by a felon.

The district court sentenced defendants-appellants to the following terms of imprisonment: Millet to one life term, plus two 20–year terms to be served concurrently with his life term, all to be served consecutively to a sentence imposed by the State of Connecticut; Roman to three life terms, plus five 10–year terms to be served concurrently with his life terms; Morales to six life terms, plus four 10–year terms and two 3–year terms, all to be served concurrently with his life terms; Rios to three life terms, plus one 20–year term to be served concurrently with his life terms; Vidro to seven life terms, plus two 10–year terms to be served concurrently with her life terms; Zapata to seven life terms, plus two 10–year terms to be served concurrently with his life terms; Burgos to one 20–year term, plus one 4–year term to be served consecutively to his 20–year term, and both to be served consecutively to a sentence imposed by the State of Connecticut and to be followed by a 3–year period of supervisory release; F. Soto to two 35–year terms, plus four 20–year terms and one 10–year term, all to be served concurrently with his two 35–year terms, to be followed by several periods of supervisory release totaling five years; Antuna to four

life terms, plus one 10–year term and one 20–year term, both to be served concurrently with his life terms; Cruz to four life terms, plus one 10–year term and one 20–year term, both to be served concurrently with his life terms; E. Rodriguez to one 30–year term to be followed by a 5–year period of supervisory release; Calderon to one 78–month term, plus one 20–month term to run consecutively to his 78–month term, to be followed by two periods of supervisory release totaling five years; and G. Rivera to one 292–month term to be followed by a 5–year period of supervisory release. The district court imposed on each defendant-appellant a $50 special assessment for each count of conviction as required under 18 U.S.C. § 3013(a)(2)(A) (1988).[1]

The claims on appeal are fully outlined in the discussion that follows. For the reasons set forth therein, we affirm the judgments of the district court.

## BACKGROUND

The present appeals arise out of the prosecution of the thirteen defendants-appellants and others for their participation in the activities of a street gang known as the "Latin Kings," whose primary business was the distribution of narcotics by means of a racketeering enterprise conducted through a campaign of violent enforcement and retribution. At their respective trials, the government presented voluminous evidence that included, *inter alia*, testimony of cooperating Latin King members and officers, testimony of law enforcement officers, firearms and drugs recovered from search warrant seizures and undercover purchases, tape recorded calls between imprisoned Latin King leader Millet and Latin King officers in Connecticut, a tape recorded call between Rios and another

---

1. Calderon and G. Rivera, who were convicted in July and September 1996, respectively, should have been assessed $100 rather than $50 for each of their counts of conviction because they were convicted after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, §§ 210–11, 110 Stat. 1214, 1240–41 (amending 18 U.S.C. § 3013(a)(2)(A) (1988)) which provided for a $100 special assessment for a defendant convicted of a felony on or after April 24, 1996. This issue, however, is not before the Court.

imprisoned Latin King officer, wiretapped conversations between Latin King members and officers in Bridgeport and New Haven, Connecticut, and physical evidence corroborating testimony of violent acts in furtherance of the gang's drug trafficking activities.

Taken in the light most favorable to the government, the government's evidence revealed the following facts.

## I. Gang Formation, Structure and Operations

The Latin Kings started out as a social organization for the advancement of the Hispanic community in the Chicago area in the 1940s. The organization spread nationally, and by the 1970s it came to be dominated by individuals engaged in criminal activity, in particular, narcotics trafficking. The Latin Kings involved in this appeal began in Connecticut in the late 1980s as a prison gang formed by Millet and Pedro Millan, who were both inmates at a Connecticut state prison. Millet and Millan drafted a charter and bylaws for the "Almighty Latin King Nation" based on principles taken from the national Latin King charter. Although Millet and Millan were moved to a federal prison in Lompoc, California, they continued to preside over the affairs of the enterprise that grew to include prison and city chapters throughout the state.

In 1992, Millet began to distrust Millan and decided to form a faction of the Latin Kings in Connecticut, which he renamed the "Almighty Latin Charter Nation" ("Latin Kings").[2] Millet controlled the organization from his California prison by mail correspondence and telephone calls with important Latin King leaders in Connecticut.

The Connecticut Board of Directors of the organization, known as the "Supreme Crown," had authority over all Latin Kings within the state. Millet was the Supreme Crown President of the Latin Kings, the position of highest authority in the gang. Roman was Chairman of the Board, Morales served as Director of Security and Beatrice Codianni served as Director of Programs and Goals.

The Latin Kings divided Connecticut into five regions.[3] Each region was controlled by a Regional Commander. The Regional Commanders controlled each of the chapters within their region and answered to the Supreme Crown. Rios served as one of the Regional Commanders.

Within each region, the Latin Kings had formed chapters in each city or town. Each chapter was controlled by a "Corona," which consisted of officers such as a President, Vice President, Chief Enforcer and Chief of Philosophy. The chapter President and other chapter officers controlled the Latin King members within their respective chapter and answered to the Regional Commander and the Supreme Crown. Vidro, F. Soto and Zapata served as officers of the Latin King chapter in New Haven. Burgos and Calderon served as officers of the Latin King chapter in Bridgeport. Because of their Supreme Crown positions, Roman and Morales played leading roles in the activities of the Latin King chapter in Bridgeport where they resided.

Members of the Latin Kings, often referred to as soldiers, were utilized by gang leaders to distribute and sell narcotics at Latin King drug blocks. In addition, soldiers were on occasion ordered by the

---

**2.** "Latin Kings" throughout the remainder of this opinion refers to the Connecticut gang under Millet's control. When the facts indicate pre–1992 activities, "Latin Kings" refers to the gang under Millet's and Millan's joint control.

**3.** Region One included Hartford and its surrounding towns, Region Three included Bridgeport and other cities in southwest Connecticut and Region Four included New Haven, Waterbury and Meriden. Regions Two and Five, both in the eastern part of the state, were far less active and organized than the other regions.

Supreme Crown or their respective Corona to conduct violent missions for the gang. The primary objectives of such missions were to physically assault, shoot or kill those who disrespected the Latin Kings, informed on its members or threatened its drug operations. Antuna and Cruz were Latin King soldiers in Bridgeport.

## II. The Prosecution

On December 8, 1994, a federal grand jury sitting in New Haven returned a superseding indictment against thirty-three defendants alleged to be officers, members or associates of the Latin Kings, charging them with numerous offenses, including racketeering, racketeering conspiracy, VICAR and drug conspiracy. On April 7, 1995, the district court severed the trial of those defendants charged only with the drug conspiracy count (the "non-RICO defendants") from the trial of the following twelve defendants (the "RICO defendants") charged with RICO and RICO conspiracy in the superseding indictment: Millet, Roman, Morales, Rios, Vidro, Zapata, Burgos, Codianni, F. Soto, Antonio Rivera, Jr. ("A. Rivera"), Antuna and Cruz. These twelve RICO defendants were to be tried ("Millet Trial") prior to the non-RICO defendants. On May 3, 1995, the grand jury returned a thirty-count, second superseding indictment charging the RICO defendants and others with various offenses, including the offenses enumerated above. A day later, RICO defendant A. Rivera pleaded guilty to the racketeering charge.

Jury selection for the RICO defendants began on June 26, 1995. Shortly thereafter, Codianni pleaded guilty to the racketeering charge, leaving ten RICO defendants for the trial that began on July 5, 1995. After seven full days of trial, Burgos entered a plea of guilty on July 18, 1995, to a two count information, charging him with VICAR and with the use of a telephone to facilitate a drug transaction. On September 29, 1995, the jury returned guilty verdicts on all counts for the remaining nine RICO defendants, with the exception of Millet, who was acquitted on one VICAR count of assault with a dangerous weapon and on one predicate act of racketeering of the RICO count for conspiracy to murder.

Following the trial and conviction of the RICO defendants, the court scheduled trials for the twenty-one non-RICO defendants, including defendants-appellants E. Rodriguez, Calderon and G. Rivera. On March 5, 1996, Calderon pleaded guilty to the second superseding indictment charging him with participating in the drug conspiracy and a one count information charging him with receiving a firearm while under indictment for a felony offense. Subsequently in 1996, E. Rodriguez and G. Rivera were both found guilty in separate trials of participating in the drug conspiracy.

Defendants-appellants were sentenced as indicated above and these appeals followed.

## DISCUSSION

Defendants-appellants jointly or individually make numerous arguments on appeal, including challenges to: (1) the government's peremptory strikes during jury selection; (2) juror conduct; (3) the jury selection system; (4) admission of prior uncharged crimes and "bad acts" into evidence; (5) preclusion of testimonial and demonstrative evidence, including a murder victim's prison records; (6) admission of co-conspirator statements; (7) sufficiency of the evidence; (8) jury instructions; (9) denial of severance motions; (10) denial of motion for a new trial; (11) denial of motion to suppress wiretap evidence; (12) denial of motion for Judge Nevas to recuse himself; (13) effectiveness of trial counsel; (14) voluntariness of a guilty plea; (15) denial of defense witness immunity; and (16) the district court's sentencing calculations. For the reasons that follow, we conclude that none of the defendants-appellants' challenges merit relief.

## I. Contentions with Respect to the Jury

### A. *Batson* Challenge

Zapata argues he is entitled to a new trial because the government exercised three of its twelve peremptory strikes in a racially discriminatory manner. Specifically, he alleges that the district court erred in (1) considering only statistical evidence and not the totality of the circumstances in determining whether a *prima facie* case of discrimination existed under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and (2) finding that the government's explanations for the peremptory strikes were not pretextual.[4] We disagree.

■ *Batson* established a three-step approach for determining whether a peremptory strike has been exercised in a racially discriminatory manner. When a *Batson* challenge is raised, the trial court must decide (1) whether the defendant has made a *prima facie* showing that the prosecution has exercised its peremptory strike on the basis of race, *id.* at 96, 106 S.Ct. 1712, (2) if so, whether the government has satisfied its burden of coming forward with a race-neutral explanation for striking the juror in question, *id.* at 97, 106 S.Ct. 1712, and (3) if so, whether the defendant has carried his burden of persuasion of proving purposeful discrimination, *id.* at 98, 106 S.Ct. 1712; *see Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam).

■ To establish a *prima facie* case, a defendant must show that the circumstances raise an inference of racial discrimination. *See Batson,* 476 U.S. at 96, 106 S.Ct. 1712. Such an inference may stem from a pattern of strikes against minority jurors included in the particular venire or even from the manner of the prosecution's questions and statements during *voir dire* examination. *See id.* at 97, 106 S.Ct. 1712. However, because of the elusive nature of the inquiry, a trial judge is not limited to just these two sources for discriminatory inferences. *See United States v. Stavroulakis,* 952 F.2d 686, 696 (2d Cir.1992). Rather, a trial judge has "broad latitude to consider the totality of the circumstances when determining whether a defendant has raised an inference of discrimination." *Id.* (citing. *Batson,* 476 U.S. at 97, 98 n. 21, 106 S.Ct. 1712).

In· the present case, the jury was selected from a 48–person venire, consisting of eight African Americans and three Hispanics. Thus, 23 percent of the venire were members of minority groups, and 16 percent were African Americans. During jury selection, the government used three of its twelve peremptory strikes against African–American members of the venire and the remaining nine against Caucasian members. Zapata argued before the district court that a *prima facie* case under *Batson* had been established because the government used 25 percent of its peremptory strikes against African–American venire persons. Therefore, he asserted that the government had to come forward with race-neutral explanations.

Before the district court decided if there was a *prima facie* showing, the government offered to put its reasons on record for striking the three African Americans and the court accepted this offer. The government explained that it challenged these venire persons because: the first was a member of the clergy who was occasionally called upon to attend at funerals and who indicated that this circumstance would affect his ability to concentrate on the case; the second was a bus supervisor in Stamford, Connecticut, who had knowledge of the Latin Kings in the area, believed that they were a good influence in the community and thought favorably of gang members for assisting bus drivers with security problems on buses;

---

4. All defendants-appellants of the Millet Trial have either specifically adopted Zapata's *Bat-* *son* challenge or joined it pursuant to Fed. R.App. P. 28(i).

and the third was a court liaison officer who assessed criminals for alternative incarceration programs and who stated that she had experience with the Latin Kings in the past and had worked with two of the defense attorneys in this case.

After hearing the government's explanations, the district court quoted *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir.1991), and found that there was no statistical inference of racial discrimination because the government's 25 percent rate of minority strikes was not significantly higher than the 23 percent minority population of the venire. *See id.* ("[I]f the minority percentage of the venire was 50, it could be expected that a prosecutor, acting without discriminatory intent, would use 50 percent of his challenges against minorities."). Further, the court noted that the 44 percent minority composition of the 16 member jury (five African Americans, two Hispanics and nine Caucasians), which exceeded the 16 percent minority population in the relevant area in Connecticut from which the jury was selected, dispels Zapata's claim that there was a pattern of discrimination by the government in exercising its peremptory strikes. The court concluded that, far from making a *prima facie* showing of a statistical imbalance, the statistics clearly indicated there was no inference of discrimination with the government's peremptory strikes. The court also found that, in assessing all of the circumstances in the case and the government's three explanations, there was no discriminatory intent involved.

■ On appeal, Zapata claims that the court erred because it only looked at statistics to determine whether a *prima facie* case was established under *Batson.* We disagree. First, although the court noted that there was no statistical inference of discrimination, it explicitly stated that it considered the totality of the circumstances in the case in finding no inference of discrimination. As to the allegation of statistical disparity, we have recognized that "[o]nly a rate of minority

challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." *Alvarado*, 923 F.2d at 255. Here, no significantly higher percentage was demonstrated. Moreover, we find that the minority composition of 44 percent on the final jury as compared to the minority composition of 16 percent in the relevant area of Connecticut also undermines Zapata's claim that the government's peremptory strikes raise an inference of discrimination. *See id.* at 255–56 (noting that where the minority percentage of the venire is unknown, a trial court may accept as a surrogate for that figure the minority percentage of the population of the judicial district from which the venire is drawn).

■ Zapata further claims that the answers given by the excused African–American jurors during *voir dire* were similar to those of the Caucasian jurors who were not challenged and, therefore, that there is an inference that the government's peremptory strikes were based solely on race. This argument has no merit. The record reflects that the answers given by these excused jurors differed in substance from those provided by other members of the venire. Although the non-challenged members expressed hardships with work and reservations about being on the jury, such concerns were not equivalent to the clergyman's inability to concentrate on the case that might result from his attendance at funerals, the bus supervisor's favorable impression of the Latin Kings or the court employee's working relationship with the Latin Kings and defense counsel. The disparity between answers of the excused African–American members of the venire and the non-challenged members belies any inference that the government's peremptory strikes were applied in a racially discriminatory manner.

■ Accordingly, we find that the district court correctly ruled that there was no inference of discrimination to establish

a *prima facie* case and, therefore, we need not reach Zapata's remaining claims under the second and third prongs of *Batson*.[5]

## B. Sleeping Juror

■ Defendants-appellants, including Zapata, asserted during trial that one of the jurors had slept during most of the presentation of the testimony. Therefore, defendants-appellants moved for the juror to be excused and for a mistrial. The district court denied the motion. On appeal, Zapata does not argue that the alleged sleeping juror should have been excused. Rather, he claims that his due process rights to a fair trial before an impartial and competent jury were violated because the district court failed to implement any procedure to investigate and cure the problem once it was brought to its attention.[6] This contention is without merit.

■ "Because of his continuous observation of the jury in court, a trial judge's handling of alleged juror misconduct ... is only reviewable for abuse of discretion." *United States v. Panebianco*, 543 F.2d 447, 457 (2d Cir.1976). Here, we find no abuse of discretion. Contrary to Zapata's assertions, Judge Nevas, from the moment the sleeping juror allegation was raised, investigated the matter and carefully observed the juror in question throughout the trial. Judge Nevas concluded that although the juror had his eyes downcast and perhaps had slept for a very brief moment, he was generally alert and attentive to the evidence. Accordingly, we find that Judge Nevas did not abuse his discretion in handling the alleged juror misconduct.

## C. Jury Selection System

E. Rodriguez argues that the district court erroneously denied his pre-trial motion[7] to stay his trial for three months to ensure that his jury was selected from a "new Qualified [Jury] Wheel which relied upon revised voter and motor vehicle records." In particular, E. Rodriguez contends that because the pool from which his jury was selected was based on the old qualified jury wheel of the Bridgeport Division of the District of Connecticut, which he alleges unfairly underrepresented Hispanics, he was denied his right to have a jury drawn from a fair cross-section of the community, in violation of the Sixth Amendment and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* (1994). This Court has already rejected the same argument in *United States v. Barnes*, 158 F.3d 662, 674 (2d Cir.1998) (citing *United States v. Rioux*, 97 F.3d 648 (2d Cir.1996), and *United States v. Fields*, 113 F.3d 313 (2d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997)). Therefore, we affirm the district court's denial of E. Rodriguez's motion to stay his trial.

## II. Challenges to Evidentiary Rulings

Defendants-appellants argue that the district court erred by (1) admitting evi-

---

**5.** Zapata also claims under the first prong of *Batson* that the answers given on *voir dire* by the excused African–American jurors did not support a for-cause challenge by the government, raising an inference that these jurors were challenged because of their race. The government counters that a lack of a for-cause challenge does not create an inference that the later exercise of peremptory challenges against these jurors was race-based. We agree with the government. Zapata ignores the distinction between for-cause challenges, permitting rejection of jurors where demonstrated bias can be shown, and peremptory challenges, "which can be used to excuse jurors for any reason, save impermissible grounds such as race or gender." *United*

States v. Torres, 128 F.3d 38, 43 n. 4 (2d Cir.1997), *cert. denied sub nom. Rivera v. United States*, —— U.S. ——, 118 S.Ct. 1399, 140 L.Ed.2d 657 (1998).

**6.** All defendants-appellants of the Millet Trial have either specifically adopted Zapata's sleeping juror claim or joined it pursuant to Fed. R.App. P. 28(i).

**7.** On March 15, 1996, non-RICO co-defendant Christopher Barnes filed a pre-trial motion challenging the jury selection system of the Bridgeport Division of the District of Connecticut and E. Rodriguez adopted it *in toto*.

dence of "other crimes" in violation of Rules 404(b) and 403 of the Fed.R.Evid.; (2) admitting the government's redirect examination of Margaret Soto ("M.Soto") without a limiting instruction; (3) precluding the testimony of Mike Soto; (4) excluding photographs of a murder scene; (5) refusing to admit prison records of a murder victim; and (6) admitting certain coconspirator statements. None of these contentions has merit; only the following warrant discussion.

## A. Admission of "Bad Act" Evidence

At the Millet Trial, the government introduced evidence of prior uncharged crimes and other bad acts that were committed by defendants-appellants and government witnesses. Such evidence included: testimony concerning Morales' drug trafficking, stockpiling of weapons to protect the gang's drug trade, and his related acts of violence; testimony that Roman ordered Latin King members to assault individuals selling drugs within his drug block; testimony that Antuna used a gun to rob someone, where such gun was later found to have been used in the murder of Latin King member Arosmo Diaz ("A.Diaz"); and testimony of cooperating Latin King members about drug sales and acts of violence they committed on behalf of the gang. The district court admitted this evidence, finding that it was relevant because it tended to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering activity by each defendant-appellant. *See United States v. DiNome,* 954 F.2d 839, 843–44 (2d Cir.1992).

Defendants-appellants of the Millet Trial assert that the district court violated Fed. R.Evid. 404(b) by admitting these bad acts as "background evidence" to show that the defendants-appellants constituted a RICO enterprise.[8] They contend that since most of them had conceded to being associated with the Latin Kings enterprise, there was no need for such bad acts evidence. Defendants-appellants also claim that this evidence was irrelevant under Fed.R.Evid. 401 and was unfairly prejudicial under Fed.R.Evid. 403 because it only served to depict them as violent drug dealers. They therefore assert that these evidentiary admissions require a reversal of their convictions. We disagree.

First, such an evidentiary ruling is reviewable only for an abuse of discretion, *see United States v. Wong,* 40 F.3d 1347, 1378 (2d Cir.1994) (citing *United States v. Brady,* 26 F.3d 282, 286 (2d Cir. 1994)), and we find no abuse here. Fed. R.Evid. 404(b) bars the admission of "[e]vidence of other crimes, wrongs, or acts" to prove the defendant's propensity to commit the crime charged. However, this rule is not controlling here, for "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy ... is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *United States v. Concepcion,* 983 F.2d 369, 392 (2d Cir.1992). Where, as in this case, "the indictment contains a conspiracy charge, 'uncharged acts may be admissible as direct evidence of the conspiracy itself.' " *United States v. Miller,* 116 F.3d 641, 682 (2d Cir.1997) (quoting *United States v. Thai,* 29 F.3d 785, 812 (2d Cir.1994)), *cert. denied,* —— U.S. ——, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998).

Moreover, as we stated in *United States v. Rosa,* 11 F.3d 315 (2d Cir.1993), "it is within the [trial] court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Id.* at 334; *see United States v. Pipola,* 83 F.3d 556, 566 (2d Cir.1996). In this case, for example, testimony of Mor-

---

**8.** Although the claims on admissibility of "bad act" evidence were raised by Morales and Roman, all defendants-appellants of the Millet Trial have either specifically adopted their arguments or joined them pursuant to Fed. R.App. P. 28(i).

ales' drug dealing for Burgos was admitted because it informed the jury how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators.

With respect to Rule 403, we also find that the district court acted well within its discretion in finding that the evidence was not unduly prejudicial. Although defendants-appellants conceded that they were associated with the Latin Kings, several issues still remained in dispute, including the existence, nature and operations of the RICO enterprise, and the related racketeering and drug conspiracies. Since the evidence had significant probative value as to these disputed matters, its admission was not "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403.

**B. Government's Redirect Examination of M. Soto**

■■■■ During the Millet Trial, defendants-appellants asked M. Soto on cross-examination whether the Federal Bureau of Investigation ("FBI") had paid her to testify, travel or take a vacation. In response, M. Soto testified that one of these payments was made to enable her to go to South Bend, Indiana, for her "own protection." The government's redirect examination probed the purpose of such payments. Judge Nevas overruled an ob-

jection by Roman and allowed M. Soto to testify that she received money from the FBI so that she could leave Bridgeport because she was scared that Roman would find out about her cooperation. Roman asserts that M. Soto's fear could not be attributed to any of his actions and, therefore, the district court erred in admitting this highly prejudicial, inflammatory testimony into evidence.[9] This argument is without merit.

■■■■ The scope of redirect examination is a matter entrusted to a trial judge's broad discretion. *See United States v. Wiley*, 846 F.2d 150, 156 (2d Cir.1988). Such redirect may be "used to rebut false impressions arising from cross-examination" and the trial judge is in the best position to determine whether such a false impression was created. *United States v. Bilzerian*, 926 F.2d 1285, 1296 (2d Cir. 1991) (citing *United States v. Mang Sun Wong*, 884 F.2d 1537, 1544 (2d Cir.1989)). Here, we find that defendants-appellants opened the door for the government's redirect by creating an impression that M. Soto was being paid for her testimony and that the government was subsidizing her alleged "vacation" in South Bend. Under these circumstances, we conclude that Judge Nevas correctly allowed M. Soto to testify about the funds she received from the government to rebut the impressions created by defendants-appellants.

---

**9.** Defendants-appellants also assert, for the first time on appeal, that (1) two lay witnesses, including M. Soto, received cash payments from the government in advance of and "for or because of" their testimony; and (2) several lay witnesses testified that the government told them if their cooperation provided "substantial assistance," the government would seek a downward sentencing departure on their behalf pursuant to § 5K1.1 of the United States Sentencing Guidelines. Relying on the reasoning of the panel in *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), *vacated and overruled en banc by* 165 F.3d 1297 (10th Cir.1999), defendants-appellants argue that the government's promises of leniency in sentencing and payment of money in exchange for testi-

mony in the several trials in which the defendants-appellants were involved, violated 18 U.S.C. § 201(c)(2). Section 201(c)(2) explicitly prohibits giving, offering or promising a thing of value for or because of testimony. *See United States v. Lowery*, 15 F.Supp.2d 1348 (S.D.Fla. Aug.4, 1998) (adopting *Singleton* and excluding testimony of cooperating witness). Because defendants-appellants failed to raise these issues to the district court or in their briefs on appeal, we deem them waived. *See Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *United States v. Bouyea*, 152 F.3d 192, 196 (2d Cir.1998) (per curiam); *United States v. Writers & Research, Inc.*, 113 F.3d 8, 13 (2d Cir.1997).

## C. Exclusion of Roman's Evidence

### 1. Preclusion of Mike Soto's Testimony

 M. Soto began to cooperate with the government two days after her brother Angel Soto ("A. Soto") was murdered, a crime she suspected Roman had committed. During the Millet trial, M. Soto was a key witness against Roman. She testified that he participated in the murder of Charles Robinson, a young drug dealer, and conspired to murder Victor Mojica, a drug dealer who had threatened Latin King Gregg Cyr, Jr.'s drug operations in Bridgeport. Roman attempted to refute M. Soto's testimony by calling a cooperating government witness, Mike Soto, as a defense witness, but the district court precluded Mike Soto from testifying on Roman's behalf.

On appeal, Roman contends that Mike Soto would have testified that his brother, A. Soto, told him that he and Luis Rodriguez ("L.Rodriguez") murdered Javier LeBron, a crime not charged in this case. From this testimony, Roman asserts that M. Soto, as sister of A. Soto, must also have known that A. Soto or L. Rodriguez killed LeBron and, therefore, she lied when she testified that she did not know who killed LeBron. Roman asserts that M. Soto lied about the LeBron murder because she was trying to protect her then-boyfriend, L. Rodriguez, from prosecution for the Robinson murder and for the conspiracy to murder Mojica. Roman claims that Mike Soto's testimony would have exculpated him by permitting the jury to draw the inference that L. Rodriguez killed Robinson and attempted to kill Mojica. Roman therefore argues that the district court erred by not permitting him to call Mike Soto. We disagree.

The district court decided to exclude Mike Soto's testimony because it found it was irrelevant under Fed.R.Evid. 401 and 402. The court determined that testimony that L. Rodriguez killed LeBron did not make it more or less probable that L. Rodriguez, not Roman, murdered Robinson and conspired to kill Mojica.

 We will not reverse the district court's determinations of admissibility of evidence unless it abused its discretion, *see* *United States v. Malpeso*, 115 F.3d 155, 162 (2d Cir.1997) (citing *Rioux*, 97 F.3d at 660), *cert. denied*, — U.S. ——, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998), and "[w]e will not overturn a trial judge's evidentiary rulings unless the judge acted arbitrarily or irrationally." *Id.* (internal quotation marks omitted). Here, we find no abuse of discretion.

First, the fact that Mike Soto may have known who killed LeBron does not support the claim that M. Soto knew and lied about it at trial. Moreover, another witness testified that he heard that L. Rodriguez and A. Soto killed Lebron. Finally, Roman's defense counsel on summation had the opportunity to argue that M. Soto was allegedly covering up for L. Rodriguez, and the district court gave careful instructions to the jury on examining a witness' credibility where there is a grant of immunity. Accordingly, we find that the district court did not abuse its discretion in excluding Mike Soto's testimony.

### 2. Exclusion of 1995 Photographs of Robinson Murder Scene

Taken in the light most favorable to the government, the evidence demonstrated the following facts. In November 1992, Roman was operating a drug block on East Main Street in Bridgeport. At this time, Roman kept seeing an adolescent, Robinson, riding a bike and selling crack cocaine on his drug block. Roman asked Robinson to leave, but he refused to do so. Roman therefore decided to kill Robinson for selling drugs on his drug block. On November 30, 1992, Roman ordered three Latin King soldiers to kill Robinson, provided them with guns, and instructed them on how to kill the adolescent. As a result, the three shot and murdered Robinson as he rode his bicycle on Booth Street, near the heart of Roman's drug block.

As part of his defense to the Robinson murder, Roman claims that M. Soto lied when she testified that while she was living with Roman on a third floor apartment on East Main Street, she observed the "flashes" from the guns used to kill Robinson on Booth Street.[10] Roman attacked M. Soto's credibility by introducing a photograph showing large buildings directly across the street from Roman's apartment that would have blocked her view of the flashes. However, the owner of the largest building across the street, testified on cross-examination that his building suffered a fire prior to 1991, and that because of its gutted condition, it was possible to see right through the second and third floors of the building all the way over to Booth Street, that is, the site of Robinson's murder.

 In addition, Roman sought to introduce two other photographs, taken by his private investigator in 1995. The first showed a view from Roman's apartment window looking toward the Robinson murder scene and the second showed a view from the crime scene looking back towards Roman's apartment. Roman also attempted to introduce a third photograph, a computer generated combination of these two photographs. The district court excluded these three photographs, but admitted a government exhibit of the same area not showing the buildings that allegedly obstructed M. Soto's view. Roman argues that the court abused its discretion by excluding his photographs while admitting the government's exhibit. We disagree.

First, the record reflects that the private investigator could not testify that the photographs he had taken in 1995 were fair and accurate depictions of the Robinson murder scene on November 30, 1992. Likewise, Roman was unable to offer foundation testimony for the computer generated photograph and, consequently, it also was properly excluded because it was based in part on one of the 1995 photo-

graphs that was found inadmissible. In view of the foregoing, we believe that there was a sufficient basis for the exclusion of the photographs and, therefore, conclude that the district court properly exercised its discretion in denying Roman's request to receive the photographs into evidence.

Moreover, we find no error in the admission of the government exhibit because it was admitted through the testimony of M. Soto, who unlike Roman's private investigator, was able to testify that this was a fair and accurate depiction of the area as it existed in November 1992. Indeed, Roman had no objection to this exhibit after he elicited testimony from M. Soto during *voir dire* that there were tall buildings right across the street from her apartment that were not depicted in the exhibit. Further, the government exhibit was countered by (1) Roman's admitted photograph that clearly showed the buildings he claimed blocked M. Soto's view as they existed in 1992; and (2) the testimony of Roman's private investigator, who testified that the third floor window from which M. Soto stated she saw the gun flashes was 28 feet from the ground, and that the large building that existed at the time of the Robinson murder was 36 feet high.

### 3. Exclusion of Robinson's Prison Records

 Roman argues that the district court erred by excluding prison records showing that murder victim Robinson had assaulted a person while in prison. Roman contends this evidence would have given the jury the opportunity to consider whether the assaulted person in jail might have been involved in Robinson's murder approximately a year later when Robinson was released. We disagree. This was creative conjecturing and the court properly exercised its discretion in excluding such speculative evidence.

10. Booth Street runs parallel to East Main Street, and the area on Booth Street where Robinson was killed was directly across from Roman's East Main Street apartment.

**D. Admission of Co–Conspirator Statements**

Cruz and Morales argue that certain out-of-court statements made after the double homicide were improperly admitted as declarations of co-conspirators under Fed.R.Evid. 801(d)(2)(E). In particular, Cruz challenges the admission of statements made by Antuna in which he describes the double homicide discussed at trial by David Soto ("D.Soto"), a Latin King who cooperated with the government. Morales challenges the admission of telephone conversations between himself and Latin King Julio Vasquez and between himself and Antuna. In addition, G. Rivera argues that certain statements made to Cyr and "Carmello," a G. Rivera lieutenant, were also erroneously admitted as coconspirator statements. These arguments are without merit.

■■■ Fed.R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(d)(2)(E) provides that, notwithstanding Rule 801(c), "[a] statement is not hearsay if . . . [it] is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In order to admit an extra-judicial statement by a co-conspirator under Rule 801(d)(2)(E), the district court must find by a preponderance of the evidence "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." *United States v. Tracy,* 12 F.3d 1186, 1196 (2d Cir.1993) (citing *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). In making a preliminary factual determination of these prerequisites, the court may consider the hearsay statements themselves. *See Bourjaily,* 483 U.S. at 181, 107 S.Ct. 2775. "However, these hearsay statements are presumptively unreliable, and, for such statements to be admissible, there must be some independent corroborating evidence of the defendant's participation in the conspiracy." *United States v. Tellier,* 83 F.3d 578, 580 (2d Cir.1996) (citation omitted).

■■■ When an objection is made to the admission of alleged hearsay statements, we review a district court's factual findings for "clear error." *United States v. Orena,* 32 F.3d 704, 711 (2d Cir.1994) (citing *Bourjaily,* 483 U.S. at 181, 107 S.Ct. 2775). "Further, the improper admission of such testimony is subject to harmless error analysis." *Id.* (citing *United States v. Rivera,* 22 F.3d 430, 436 (2d Cir.1994)). When no objection is raised at trial, however, we will only review the district court's factual findings if there was plain error, that is, if there was "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Gore,* 154 F.3d 34, 42 (2d Cir.1998) (internal quotation marks and alterations omitted) (quoting *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (quoting, in turn, *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993))).

**1. Cruz**

Taken in the light most favorable to the government, the evidence showed that during the fall of 1993 and spring of 1994, Vasquez was operating a drug spot in New Haven. The spot employed several Latin King street sellers. At the time, Vasquez and Morales became partners and Morales supplied Vasquez with crack. In addition, Vasquez supplied cocaine to A. Diaz who sold it within the same area. In the spring of 1994, Vasquez had several conversations with Morales about problems with A. Diaz, including rumors that A. Diaz was an in-

formant on the Latin Kings' drug activities.

On April 29, 1994, after an extensive investigation, police raided the New Haven drug spot and arrested Vasquez and several other Latin King drug dealers. A. Diaz was not one of those arrested. Police seized from Vasquez's residence crack and cash proceeds from crack sales, which was provided to Vasquez by Morales. From jail, Vasquez called Morales and cryptically told him that A. Diaz was an informant on Latin King drug dealers in New Haven and Bridgeport, and thus, was responsible for Morales' and Vasquez's loss of crack to the police. Shortly thereafter, Morales ordered the murder of A. Diaz. On May 14, 1994, Antuna and Cruz, Latin King members acting on the orders of Morales, shot and killed A. Diaz and his friend Tyler White in Bridgeport. White was killed because he happened to be with A. Diaz at the time of the murder.

Cruz argues that the district court improperly admitted the testimony of D. Soto concerning hearsay statements by Antuna directly implicating Cruz in the A. Diaz and White double murder. D. Soto testified (1) that a couple of days after the murders, Antuna told him that Cruz shot and killed White instantly from the backseat of a car with a .45 caliber gun; (2) that Antuna shot A. Diaz in the car with a 9mm gun, and then chased and killed him; (3) that they killed A. Diaz because he was an informant; and (4) that they were going to kill Adam Cintron, who was an associate of A. Diaz and with him the night of the murder, but they could not find him.

Over defense counsel's hearsay objections, the district court admitted Antuna's statements to D. Soto as co-conspirator statements under Rule 801(d)(2)(E). Cruz asserts that this ruling was clearly erroneous and violated his confrontation rights because there was no corroborating evidence, independent of Antuna's statements, that Cruz was a member of the conspiracy, that Cruz and Antuna were co-conspirators or that Antuna's confession

about the double murder to D. Soto was made in furtherance of a conspiracy between Antuna and Cruz. In addition, Cruz contends that Antuna's out-of-court statements were not offered pursuant to a "firmly rooted" exception to the hearsay rule and lacked particularized guarantees of trustworthiness. We find Cruz's protestations unpersuasive.

First, there was ample independent evidence corroborating that Cruz was a member and participant in the racketeering and drug conspiracies of the Latin Kings, as well as the conspiracy to murder A. Diaz. With respect to the murder conspiracy, the record clearly reflects that (1) Cruz was a Latin King member; (2) Cruz was a close associate of Antuna's; (3) Cruz frequented the backroom of an establishment where influential Latin Kings congregated and where Antuna received word that A. Diaz was to be killed; (4) Cruz accompanied Antuna to an apartment the night of the murder to retrieve the guns used for the murders; (5) Cruz and Antuna were with the victims minutes before the murder; (6) forensic evidence established they were in the exact location where the murders were committed; (7) Cruz and Antuna matched the physical descriptions of the gunmen given by eyewitnesses; (8) Cruz's and Antuna's fingerprints were found on the door handles of the car where the murders occurred; and (9) Cruz and Antuna were seen together minutes after the murders at D. Soto's apartment.

In addition to evidence corroborating Cruz's participation in the murder, we find that there was additional independent evidence that corroborated other aspects of Antuna's statements to D. Soto. For example, Antuna's statements to D. Soto that he used a 9mm gun to kill A. Diaz and that Cruz used a .45 caliber gun to kill White were confirmed by ballistic evidence showing that the murder victims were killed by such firearms. Further, Antuna's statement to D. Soto that A. Diaz was killed because he was informing on the gang's

drug operations was corroborated by the testimony of Cyr and Vasquez, and by intercepted phone conversations between Morales and Antuna, that established the motive for the murder of A. Diaz. Moreover, Antuna's remark to D. Soto that he had sold the 9mm murder weapon to a Latin King from Hartford was corroborated by Ray Perez, a Latin King from Hartford, who was arrested with a 9mm gun in July 1994 and who testified that he bought the gun from a group of Latin Kings in Bridgeport in May 1994. Therefore, we conclude that the evidence amply corroborated Antuna's statements that he and Cruz committed the double murders.

■ Next, Cruz argues that even if he participated in the double murders, there was no independent evidence that he participated in the charged racketeering and drug conspiracies. Cruz relies on *Tellier*, 83 F.3d at 580–81, for the proposition that proof of participation in a RICO conspiracy cannot come solely from proof of predicate acts of racketeering based on challenged hearsay. However, unlike *Tellier* where the challenged hearsay statement was the only evidence of the defendant's participation in the conspiracy, and thus, the hearsay statement was held inadmissible, we find here that Antuna's statements against Cruz are admissible because there is, as noted above, ample, independent evidence corroborating his statements. Moreover, the Supreme Court noted in *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), that proof of participation in a RICO conspiracy is possible when a conspirator intends "to further an endeavor which, if completed, would satisfy all the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* 118 S.Ct. at 477. Since Cruz's membership in the Latin Kings and participation in the double murder demonstrated that he adopted the goal of furthering the criminal endeavors of the gang, we conclude that the district court correctly found that

he was a participant in the racketeering conspiracy. Likewise, the evidence supports the court's finding that Cruz had joined and acted on behalf of the drug conspiracy.

■ Cruz further argues that the district court clearly erred in concluding that Antuna's statements to D. Soto about the double murder were made "in furtherance" of the racketeering conspiracy. Cruz asserts that Antuna's statements to D. Soto were in reality a confession, and at best "idle chatter" that did not further the goals of the racketeering conspiracy. We disagree.

■ We have held that the term "in furtherance of the conspiracy" implies that "the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example ... seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy." *Tracy*, 12 F.3d at 1196 (citations omitted).

This "in furtherance" requirement is not met by a narrative conversation that amounts to mere "idle chatter." *See United States v. Paone*, 782 F.2d 386, 390 (2d Cir.1986). However, in this case, Antuna's statements to D. Soto were not idle chatter for they clearly promoted the goals of the racketeering and drug conspiracies. For example, Antuna told D. Soto (1) to bring him clothes when he was on the run; (2) that he and Cruz committed the murders; and (3) that he sold his 9mm gun after the murders. These statements showed that Antuna attempted to apprise D. Soto of the progress or status of the conspiracy, to facilitate and encourage his assistance, and to foster the cohesiveness of the conspiracy. As a result, we find that Antuna's statements satisfy the "in furtherance" requirement.

■ Nevertheless, Cruz argues that even if Antuna's statements to D. Soto could be considered "in furtherance of the

conspiracy," this is an expansion of the co-conspirator hearsay rule because such statements fall outside of the "firmly rooted" exception and, therefore, this requires particularized guarantees of trustworthiness. In particular, Cruz contends that a recent proliferation of RICO cases has expanded the co-conspirator exception to the hearsay rule to include some narrative statements about past events on the theory that they serve to foster trust and cohesiveness among group members or inform each other as to the progress or status of the RICO conspiracy. Cruz maintains that because these developments are far too recent to be considered "firmly rooted," a narrative account under such a theory should be presumed unreliable and inadmissible without particularized guarantees of trustworthiness of a co-conspirator's hearsay statements. Since no such guarantees were set forth, Cruz claims that the admission of Antuna's statements violated his rights under the Confrontation Clause of the Sixth Amendment.

We find that this argument is without merit. In *Bourjaily,* the Supreme Court clarified that "[b]ecause hearsay rules and the Confrontation Clause are generally designed to protect similar values . . . no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception . . . [such as] the co-conspirator exception to the hearsay rule." 483 U.S. at 182–83, 107 S.Ct. 2775 (internal quotation marks and citations omitted). Accordingly, the Court held that the "Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." *Id.* at 183–84, 107 S.Ct. 2775. Since we found that Antuna's statements meet the requirements of Rule 801(d)(2)(E), that is, the statements were not merely idle chatter, but were made during the course of and in furtherance of

the conspiracy, we reject Cruz's assertion that the admission of these statements violated his constitutional rights under the Confrontation Clause.

## 2. Morales

Morales challenges the admission of a recorded telephone conversation between himself and Antuna that occurred after the night of the A. Diaz and White murders in which they discussed the double homicide and the ensuing police investigation. Prior to trial, Morales moved to dismiss count 24 of the first superseding indictment, a VICAR conspiracy count that alleged that he conspired to murder A. Diaz in violation of Conn. Gen.Stat. Ann. §§ 53a–48, 53a–54a, and 18 U.S.C. § 1959(a)(5). One of the overt acts in count 24 [11] that the government alleged in furtherance of Morales' conspiracy to murder A. Diaz is the challenged, recorded telephone conversation between himself and Antuna. Morales argued that this overt act was legally insufficient because, under Connecticut law, once a conspiracy to commit murder culminates with the murder of the victim, the conspiracy ends, and thus, subsequent declarations are not "in furtherance of the conspiracy" and may be held inadmissible. Although Morales recognized that state pleading, procedural and evidentiary rules are not incorporated into § 1961 under the RICO statute, he argues that § 1959 of the VICAR statute is different and should be read to incorporate Connecticut's evidentiary rule regarding admissibility of evidence after a conspiracy to murder ends. The district court dismissed his motion, holding that § 1959 does not incorporate state substantive law. *See United States v. Morales,* 881 F.Supp. 769, 772 (D.Conn. 1995). On appeal, Morales argues that the court erred by denying his motion, and even if Connecticut's evidentiary law is not binding, he asserts his conversation with

---

**11.** Although Morales went to trial under the second superseding indictment which omitted the overt acts of count 24 of the first superseding indictment, count 24 of the second superseding indictment still alleged the same crime, and the overt acts remained at issue throughout the Millet Trial.

Antuna was not in furtherance of the conspiracy to murder A. Diaz for the conspiracy ended with the murder. We disagree.

First, in *Paone*, we held that the language of 18 U.S.C. § 1961(1)(A), which defines racketeering activity as any act or threat involving murder which is chargeable under State law and punishable by imprisonment for more than one year, was "not intend[ed] to incorporate the various states' procedural and evidentiary rules into the RICO statute." 782 F.2d at 393; *see United States v. Friedman*, 854 F.2d 535, 565 (2d Cir.1988). Rather, "[t]he statute is meant to define, in a more generic sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge." *Paone*, 782 F.2d at 393; *see United States v. Coonan*, 938 F.2d 1553, 1563–65 (2d Cir.1991). Similarly, in our view, the gravamen of § 1959 is a violation of federal law and, therefore, reference to "violation of any laws of any State" in the statute merely defines the unlawful conduct constituting the predicate offense. Thus, the statute does not incorporate the substantive requirements of state law. Consequently we conclude that the court correctly ruled that a state's evidentiary rule underlying a conspiracy to murder offense is not incorporated into a VICAR prosecution.

Second, Morales' and Antuna's statements are admissible under Rule 801(d)(2)(E) because the record reflects that they were made in furtherance of the racketeering conspiracy, irrespective of whether or not the conspiracy to murder A. Diaz was completed. Accordingly, we conclude that the court properly admitted the recorded telephone conversation between Morales and Antuna.

### 3. G. Rivera

Cyr testified at trial, without objection, that other drug dealing co-conspirators told him that G. Rivera supplied cocaine for their drug operation. G. Rivera argues that the district court improperly admitted these co-conspirator statements because they were not made during the course, or in furtherance, of the drug conspiracy as required by Rule 801(d)(2)(E). G. Rivera contends such admission constitutes plain error. We disagree.

First, the government amply demonstrated that all of the challenged statements were made during the time of the charged conspiracy and while the co-conspirators were engaged in drug trafficking. Second, each of the challenged statements were in furtherance of the conspiracy. For instance, the record reflects that each statement was made by a co-conspirator to Cyr while he was acting as an integral member of the Latin King's drug conspiracy. Further, the evidence demonstrates that the co-conspirator statements made to Cyr served (1) to inform the co-conspirators as to the progress or status of the conspiracy; (2) to facilitate and protect their drug dealing activities; (3) to identify other co-conspirators; (4) to inform Cyr about the persons with whom he would be working; and (5) to prepare him for the role he would play in the drug conspiracy. *See Rivera*, 22 F.3d at 436; *Tracy*, 12 F.3d at 1196; *United States v. Maldonado–Rivera*, 922 F.2d 934, 959 (2d Cir.1990); *United States v. Rahme*, 813 F.2d 31, 35–36 (2d Cir.1987). In addition, there was wiretap evidence that independently corroborated Cyr's testimony concerning the co-conspirator statements, and, in turn, such wiretap evidence was corroborated by law enforcement surveillance. Finally, given the extent of the evidence against G. Rivera concerning his role as a major supplier of drugs to leading Latin King dealers from 1991 through 1994, we conclude that even if there were any error in the admission of some of the challenged co-conspirator statements about his drug dealing activities, it was harmless and would certainly not constitute plain error.

### E. Admission of D. Soto's and Cintron's Out–of–Court Statements

Cruz challenges certain out-of-court statements made by D. Soto and

Cintron, who both implicated Cruz in the double homicide of A. Diaz and White. First, during his direct testimony, D. Soto was asked by the prosecution what Antuna told him about the double homicide. D. Soto answered that Antuna confessed he and Cruz killed them. The prosecution further questioned D. Soto about Antuna's statements, but he could not recall certain minor details. After D. Soto testified that he had been interviewed by the FBI concerning Antuna's statements, the prosecution showed him a single paragraph of the FBI report of the interview to refresh his recollection of these details, but D. Soto replied he still could not remember. The direct examination then proceeded to more substantive questions about what Antuna told D. Soto. Cruz asserts that D. Soto's subsequent testimony regarding what Antuna mentioned about the murders was not based on D. Soto's present recollection, but from reviewing his prior statement in the FBI interview report. Therefore, Cruz argues D. Soto used his prior out-of-court statement, that is, inadmissible hearsay, as a substitute for actual memory to testify about Antuna's statements. We disagree.

There is no evidence in the record to support Cruz's claim that the government's failed attempt to refresh D. Soto's recollection about certain minor details was, in fact, a pretext for allowing D. Soto to testify from his prior out-of-court statement in the FBI interview report. Indeed, the record shows that there were no further references to this report after the government was unable to refresh D. Soto's memory from the one paragraph, and that subsequent testimony was from actual memory. Further, Cruz did not object to the prosecutor's questions during the contested portion of D. Soto's testimony. Accordingly, we find that the admission of D. Soto's statement was not plain error.

Next, Cruz contests Cintron's out-of-court statement made the day after the murder to Elizabeth Wynne, who was A. Diaz's girlfriend. On direct examination, the government asked Cintron about an argument he had with Wynne where she demanded that he give her a gold necklace that had belonged to A. Diaz. Cintron testified that he refused to give her the necklace because he bought it from A. Diaz. Cintron also explained to her that she could not have it back for he felt just as bad as she did and that he was also A. Diaz's close friend. The government further asked Cintron whether he told Wynne during this argument that "at least you didn't have to watch him die." Cintron denied making such a statement; rather, he testified that he told her "I'm the one that had to identify his body, I feel just as bad as you do." Over defense counsel's objection, the district court admitted Cintron's testimony of this out-of-court statement. The government explained that it sought the admission of this statement because it wanted to limit the impact of the impeachment of Cintron's credibility on cross-examination regarding the statement. Indeed, on cross-examination of Cintron, Cruz's counsel inquired about Cintron's argument with Wynne. Moreover, during Cruz's defense, his counsel called Wynne as a witness and she testified that Cintron said during their argument that "you didn't have to watch him die."

Cruz also contests Cintron's out-of-court statement related by Alexza Berrios during her direct testimony, concerning what happened the morning after the A. Diaz and White murders when Cintron arrived at her apartment. The prosecutor asked Berrios what Cintron told her that morning, and when she began to reply, defense counsel objected on hearsay grounds. The government argued that her testimony about Cintron's statements was not offered for the truth, but merely to explain Berrios' subsequent actions. The district court allowed Berrios to testify that Cintron told her that "he had left them down there and that he had left New Haven and that he was worried about [A. Diaz]." She then explained how she and Cintron looked for

A. Diaz and then went to the police station and discovered that he was dead. On cross-examination, defense counsel elicited testimony from Berrios regarding a number of statements Cintron made to her that morning.

Relying on *Tome v. United States*, 513 U.S. 150, 156–57, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (discussing Fed. R.Evid. 801(d)(1)(B)), Cruz argues that Cintron's out-of-court statements to Wynne and Berrios were inadmissible hearsay because they were (1) prior consistent statements that were admitted on Cintron's and Berrios' direct before Cintron was cross-examined, and thus, were not offered to rebut anything; (2) made the day after the murder and, therefore, Cintron allegedly developed a motive to fabricate the statements, because according to Cruz, Cintron participated in the murders; and (3) merely offered to bolster the credibility of Cintron's story that he was not involved in such murders. In addition, Cruz asserts that merely because the government identified a relevant non-hearsay use of Cintron's statement related by Berrios (that is, it was used to explain Berrios' actions that morning), it was still inadmissible because the jury likely considered the statement for the truth of what was stated, and thereby, this overly prejudiced Cruz. These contentions are without merit.

▬ Cintron's statement to Wynne was not offered as a prior consistent statement. Rather, the government offered his statement to reduce the impact of impeachment testimony later presented by Cruz. Under these circumstances, it is well established that the government can develop impeachment material during direct examination of a cooperating witness, who testifies pursuant to a proffer agreement, in order to anticipate questions on cross-examination that the government was concealing a relevant fact. *See United States v. Cosentino*, 844 F.2d 30, 33 (2d Cir.1988) ("It may sometimes be useful ... to develop impeaching matter in direct examination of a

'friendly' witness in order to deprive an adversary of the psychological advantage of revealing it to the jury for the first time during cross-examination."). Moreover, it is unlikely that Cintron's statement to Berrios had a significant effect on the jury, and thus any possible prejudice to Cruz was slight. Even if Cintron's statements were erroneously admitted, we conclude that the admission was harmless in light of the defense's cross-examinations of Wynne and Berrios. Accordingly, the district court's admission of such statements does not constitute reversible error.

## III. Challenges to Sufficiency of Evidence

Several defendants-appellants contend that the evidence was insufficient to support their convictions on their respective RICO, VICAR or drug conspiracy counts. We address their arguments seriatim.

### A. Standard of Review

▬ An appellant who challenges the sufficiency of the evidence bears a heavy burden. *See United States v. Walker*, 142 F.3d 103, 112 (2d Cir.), *cert. denied,* — U.S. —, 119 S.Ct. 219, 142 L.Ed.2d 181 (1998); *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir.1997), *cert. denied sub nom. Fernandez v. United States,* — U.S. —, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998). In reviewing such a challenge, we must view the evidence, whether direct or circumstantial, in the light most favorable to the government and credit every inference that could have been drawn in its favor. *See United States v. Salameh*, 152 F.3d 88, 151 (2d Cir.1998) (per curiam), *cert. denied,* — U.S. —, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999). Further, we assess the evidence not in isolation but in conjunction, *see United States v. Podlog*, 35 F.3d 699, 705 (2d Cir.1994), and the convictions must be affirmed, so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *see Jackson v. Virginia*, 443 U.S.

307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Rosa*, 11 F.3d at 337.

### B. Evidence of Obstruction of Justice

Millet and F. Soto claim that the evidence failed to show that they obstructed justice by tampering with informants, in violation of 18 U.S.C. § 1512(b)(3) (1988). We disagree.

#### 1. Millet

Taken in the light most favorable to the government, the evidence revealed that in late 1993 and early 1994, Millet had several telephone conversations while in federal prison with Jose Rodriguez ("J.Rodriguez"), the then-Regional Commander of the Latin Kings in New Haven. J. Rodriguez reported in general terms that he suspected that a Latin King member was providing information about the gang's activities to New Haven police officers. Millet responded by encouraging J. Rodriguez to impose discipline upon the suspected informant. J. Rodriguez testified that these conversations led to the beating of Jose Garcia.

A New Haven police officer testified that he saw Garcia in January 1994 with bruises on his face and body and that Garcia did not want to speak with the officer. Despite J. Rodriguez's suspicions and the "beat down," Garcia was not, in fact, an informant.

At the time of Millet's conversations with J. Rodriguez, there was an extensive federal investigation underway of the Latin Kings. The investigation was being conducted by a task force which included the FBI, the Drug Enforcement Administration, the Connecticut State Police, as well as the New Haven and Bridgeport Police Departments.

Nonetheless, Millet asserts that the government did not introduce any evidence that he or J. Rodriguez had any indication that federal authorities were investigating Latin King activities, despite the fact that conversations between Millet and J. Rodriguez were tape-recorded by the government while Millet was being held in federal prison in California. Millet therefore argues that the government failed to satisfy the federal jurisdictional element of § 1512(b)(3) because (1) Garcia was not actually providing information to any law enforcement, let alone federal officers; and (2) Millet only intended to prevent Garcia from speaking with local, rather than federal law enforcement officers. These arguments are without merit.

In deciding whether there is a lack of federal jurisdictional nexus, our starting point must be the language of the statute itself. Section 1512(b)(3) makes it unlawful to use physical force "with intent to ... hinder, delay or prevent the communication to a law enforcement officer ... of the United States of information relating to the commission or possible commission of a Federal offense." Subsection (a)(4) of 18 U.S.C. § 1515 defines a "law enforcement officer" as "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government." Section 1512(f) notes that "no state of mind [of the defendant] need be proved with respect to the circumstance ... that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government."

As to Millet's first contention, under the plain language § 1512(b)(3), it is irrelevant whether Garcia actually contemplated going to law enforcement. The statute's reference to "intent to ... hinder, delay or prevent the communication" reaches potential informants. *See United States v. Romero*, 54 F.3d 56, 62 (2d Cir. 1995) (citing *United States v. Hernandez*, 730 F.2d 895, 898 (2d Cir.1984)). Likewise, the plain language of § 1512(f) makes it irrelevant that Millet only "intended" to prevent Garcia from speaking with local, rather than federal, law enforcement officers. Section 1512(f) expressly does not require that the government

prove a defendant's "state of mind" with respect to the federal character of the law enforcement officer. *See* 18 U.S.C. § 1512(f); *United States v. Gonzalez,* 922 F.2d 1044, 1054 (2d Cir.1991). Rather, as the Third Circuit found in *United States v. Bell,* 113 F.3d 1345 (3d Cir.), *cert. denied,* — U.S. ——, 118 S.Ct. 447, 139 L.Ed.2d 383 (1997), the statute mandates that:

> [T]he government must prove that at least one of the law-enforcement-officer communications which the defendant sought to prevent would have been with a federal officer, but that the government is not obligated to prove that the defendant knew or intended anything with respect to this federal involvement. . . . [T]he government may carry this burden by showing that the conduct which the defendant believed would be discussed in these communications constitutes a federal offense, so long as the government also presents "additional appropriate evidence."

*Id.* at 1349 (quoting *United States v. Stansfield,* 101 F.3d 909, 918 (3d Cir. 1996)). Although *Bell* concerns subsection (a)(1)(C) of § 1512, we conclude that its reasoning applies here as well because the elements of subsection (b)(3) are similar to the elements of subsection (a)(1)(C). *See United States v. Gabriel,* 125 F.3d 89, 103 (2d Cir.1997) (comparing § 1512(b)(1) to § 1512(a)(1)(C)).

In this case, the government presented sufficient evidence for a jury to reasonably conclude (1) that Millet intended to prevent Garcia from communicating with local police because he feared that Garcia would provide information on the Latin Kings' racketeering activities, which clearly constitute federal offenses; (2) that Millet knew federal authorities could record his telephone conversations with J. Rodriguez; and (3) at the time of these conversations, federal authorities were in fact working closely with local police on a massive federal investigation of the gang's drug activities. Therefore, we find that a jury could

reasonably have inferred from this evidence that if the potential informant communicated with the local police concerning Latin King activities constituting federal offenses, at least one of his communications would have been with a federal law enforcement officer. Accordingly, we conclude that there was sufficient evidence to satisfy the federal jurisdictional element of § 1512(b)(3).

### 2. F. Soto

Likewise, F. Soto was charged with obstruction of justice for using physical force against an individual known as "Curly" with intent to hinder, delay and prevent him from communicating to federal law enforcement officers about Latin King drug operations. The only testimony showing F. Soto committed this racketeering act was that of Jesse Rodriguez, a Latin King member. Jesse Rodriguez testified that he was arrested for drug charges in January 1994 because Curly had informed police about his drug trafficking operations. Thus, Jesse Rodriguez testified that he asked F. Soto to "beat down" Curly for being an informant. On cross-examination, Jesse Rodriguez further stated (1) that F. Soto confessed to him that he had beaten down Curly; and (2) that Curly told him that he had been beaten down. The only other witness who testified regarding this predicate racketeering act was an FBI agent who was working with local police on the investigation of the Latin Kings and Jesse Rodriguez's drug activities. The agent informed the court that Curly was in fact an informant who provided information on Jesse Rodriguez's drug operation, but that he did not have any knowledge that Curly had been beaten up by F. Soto. Thus, F. Soto argues that the uncorroborated testimony of Jesse Rodriguez, regarding F. Soto's confession and Curly's statement, is insufficient, without more, to prove that the beating of Curly ever occurred, or even if it occurred, that F. Soto took part in it. We disagree.

In addition to the general principles noted above in reviewing sufficiency of the evidence claims, we have recognized that "[a] conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Gordon,* 987 F.2d 902, 906 (2d Cir.1993) (citing *United States v. Parker,* 903 F.2d 91, 97 (2d Cir. 1990)). Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency, and a challenge to "[t]he weight is a matter for argument to the jury, not a ground for reversal on appeal." *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.1989). In this case, we find that the record reflects that Jesse Rodriguez's testimony regarding the "beat down" of Curly was not incredible on its face. Therefore, we will not disturb the jury's findings with respect to the weight of the uncorroborated co-conspirator testimony.

## C. Evidence of Conducting a RICO Enterprise

Antuna and Cruz argue that the government failed to demonstrate that they conducted or participated in the affairs of the Latin Kings enterprise as required for a RICO conviction under 18 U.S.C. § 1962(c). We disagree.

In *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that " 'to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs,' [as required by] § 1962(c), one must participate in the operation or management of the enterprise itself," *id.* at 185, 113 S.Ct. 1163, and at a minimum must play "some part in directing the enterprise's affairs," *id.* at 179, 113 S.Ct. 1163. The Court recognized that those who operate or direct a RICO enterprise sufficient to conduct its affairs are not limited to "upper management," but might also be "lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184, 113 S.Ct. 1163.

Under the *Reves* operation-management test, even if a defendant is not acting in a managerial role, we have held that he can still be liable for directing the enterprise's affairs if he "exercised broad discretion" in carrying out the instructions of his principal. *Napoli v. United States,* 45 F.3d 680, 683 (2d Cir.1995). However, we have noted in *United States v. Viola,* 35 F.3d 37 (2d Cir.1994), that "the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *Id.* at 41.

In the present case, Antuna and Cruz argue that RICO liability does not extend to them because there is no evidence to show that they played any part in directing the affairs of the Latin Kings' enterprise. They analogize their circumstances to those of the appellant in *Viola.* In that case, a janitor and handyman for the kingpin of a RICO enterprise transported stolen goods to buyers and returned most of the proceeds from the sales of such goods to the kingpin. The janitor acted under the direction of the kingpin and without discretionary authority in carrying out such orders. This Court found that although the janitor's acts "might have contributed to the success of the RICO enterprise, he simply did not come within the circle of people who operated or managed the enterprise's affairs." *Id.* at 43. Therefore, "[a]lthough *Reves* still attaches liability to those down the 'ladder of operation' who nonetheless play[ed] some management role ... § 1962(c) liability cannot cover [the janitor for he] ... was not on the ladder at all, but rather, as [the kingpin's] janitor and handyman, was sweeping up the floor underneath it." *Id.*

Here, the record makes clear that Antuna and Cruz were both on the ladder, rather than under it. First, they killed A. Diaz, a suspected informant, at the behest

of Latin King leaders. In addition, Antuna and Cruz's decision to kill White and thereby eliminate a potential witness to the A. Diaz murder demonstrates that they had discretionary authority in carrying out the instructions of their principals. Accordingly, we find that there was sufficient evidence that Antuna and Cruz had roles in directing the affairs of the Latin Kings' enterprise to support their RICO convictions.

## D. Evidence of Pattern of Racketeering Activity

 Antuna, Cruz and F. Soto argue that the evidence was insufficient to sustain their RICO convictions because the government failed to show that they engaged in the Latin Kings' enterprise "through a pattern of racketeering activity" as required by 18 U.S.C. § 1962(c). We disagree.

 In order to have been engaged in a "pattern of racketeering activity," the government must prove that (1) the defendant committed at least two predicate acts of racketeering within ten years of one another, *see* 18 U.S.C. § 1961(5) (1988); (2) that these racketeering predicates are interrelated; and (3) that they reveal continued, or the threat of continued, racketeering activity, *see H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 236–39, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The requirements of relatedness and continuity prevent the application of RICO to isolated or sporadic criminal acts. *See United States v. Indelicato*, 865 F.2d 1370, 1375–76, 1381–82 (2d Cir.1989). Relatedness may be established by showing that the predicate acts have " 'the same or similar purposes, results, participants, victims, or methods of commission.' " *H.J., Inc.*, 492 U.S. at 240, 109 S.Ct. 2893 (quoting 18 U.S.C. § 3575(e) (1988)). The continuity prong of a RICO pattern "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects

into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. 2893.

### 1. Antuna and Cruz

In the present case, the jury found that the pattern of racketeering activity committed by Antuna and Cruz under the RICO count consisted of three predicate acts of racketeering: (1) participation in the Latin Kings drug conspiracy; (2) conspiracy to murder and the murder of A. Diaz; and (3) the murder of White. Antuna and Cruz contend that there was insufficient evidence that they participated in the drug conspiracy and, more particularly, that Cruz joined the charged conspiracy to do so. Further, Antuna and Cruz argue that the murders of A. Diaz and White are insufficient to constitute a RICO pattern because the murders were simultaneous acts committed in a single episode and there was no external evidence of continued, or threat of continued, racketeering activity stemming from the event. These contentions are without merit.

It is apparent that there was sufficient evidence that Cruz was a member of the Latin Kings and that he and Antuna conspired to distribute drugs for the gang. Moreover, the evidence indicates that they murdered A. Diaz to eliminate a suspected informant who threatened Latin King drug dealers, and they murdered White to eliminate a witness to A. Diaz's murder. Thus, their predicate acts meet the relatedness requirement because such acts had the same participants and the same purpose, that is, to further the drug conspiracy.

 Regarding the continuity requirement, this Court has noted that "[t]he nature of the enterprise may … serve to show the threat of continuing activity. Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity." *Indelicato*, 865 F.2d at 1383–84. Here, we find that the continuity requirement is met because the murders and the nature of the

Latin King enterprise clearly demonstrated a threat of continuity. The Latin Kings were engaged in racketeering activities, in particular, drug trafficking and related violence. The murder of a suspected informant and the simultaneous murder of an innocent bystander directly carried with it the threat of continued drug trafficking and associated violence to protect the gang's narcotics operations and members. *See United States v. Simmons,* 923 F.2d 934, 951 (2d Cir.1991) (noting that where RICO murders were partly intended to maintain discipline within a drug gang and to protect its narcotics operation, the "very nature [of] these acts threatened repetition and thereby satisfied the continuity prong of the pattern requirement."). Accordingly, we conclude that there was sufficient evidence that Antuna and Cruz were engaged in a pattern of racketeering activity to sustain their convictions under § 1962(c).

### 2. F. Soto

■ The jury found that F. Soto committed the following three predicate acts of racketeering under the RICO count: (1) participation in the drug conspiracy; (2) conspiracy to murder three individuals in retaliation for being shot himself; and (3) obstruction of justice by tampering with an informant known as Curly to prevent him from communicating with federal law enforcement regarding Latin King drug operations. F. Soto argues that the government failed to present evidence that he committed two of his three predicate acts, conspiracy to murder and tampering with an informant, and, therefore, his remaining predicate act, drug conspiracy, is not sufficient by itself to constitute a pattern of racketeering activity to support his RICO conviction. We disagree.

First, we have already determined above that there was sufficient evidence to support his predicate act of obstructing justice. Second, there was ample evidence showing that F. Soto conspired to murder three individuals. Moreover, testimony of co-conspirators, when viewed in the light most favorable to the government, demonstrated that F. Soto requested and solicited the drive-by-shooting by asking for authorization from Latin King leaders and requesting retaliatory action from other Latin King members. F. Soto also aided and abetted the venture by identifying the targets and their whereabouts. Finally, such testimony showed that F. Soto knowingly and intentionally joined in a conspiracy to murder the people who shot him. We therefore conclude that the evidence was sufficient to show that F. Soto engaged in a pattern of racketeering activity under the RICO count.

F. Soto was also charged under four VICAR counts with conspiring to murder, and aiding and abetting in the assault of three individuals, in violation of 18 U.S.C. § 1959(a). For the same reasons set forth in the above paragraph, we find that there was sufficient evidence to sustain F. Soto's VICAR convictions.

### E. Evidence of Maintaining or Increasing Position in the RICO Enterprise

■ Antuna, Cruz and Morales contend that the evidence was insufficient to sustain their VICAR convictions for aiding and abetting, conspiring to commit or committing murders, in violation of 18 U.S.C. § 1959(a). Specifically, they argue that there was insufficient evidence to show that they committed these violent crimes for the purpose of "maintaining or increasing" their positions within the Latin Kings' enterprise under § 1959(a).

■ In order to prove that conspiring to murder or murder was " 'for the purpose of ... maintaining or increasing [a] position in' a RICO enterprise, the government is required to prove, *inter alia,* that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise." *Thai,* 29 F.3d at 817 (ellipses in original) (citing *Concepcion,* 983 F.2d at 381). As to the motive requirement,

"[s]elf-promotion need not have been the defendant's only, or even his primary, concern, if [the act] was committed 'as an integral aspect of membership' in the enterprise." *Id.* (quoting *Concepcion,* 983 F.2d at 381). Thus, the motive requisite is satisfied if " 'the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.' " *Id.; see United States v. Polanco,* 145 F.3d 536, 540 (2d Cir.1998), *cert. denied,* — U.S. ——, 119 S.Ct. 803, 142 L.Ed.2d 664 (1999); *United States v. Locascio,* 6 F.3d 924, 940 (2d Cir.1993).

### 1. Antuna and Cruz

In this case, it is clear that Antuna and Cruz were members of the Latin Kings at the time of the A. Diaz and White murders, and that they conspired to commit and committed these murders as part of and in furtherance of their membership in the Latin Kings enterprise. The evidence amply supports that Antuna and Cruz killed A. Diaz because the Latin Kings suspected he was an informant who could harm the enterprise's narcotics operations. Similarly, they killed White to eliminate him as a witness to their murder of A. Diaz performed in furtherance of the drug conspiracy. Indeed, Antuna summed up his motive after he was arrested when his girlfriend told him that Morales would not see her. Antuna stated that "you go all out for the Family and this is how they repay you."

Although conceding that the motive element might have been established as to Antuna, Cruz argues that there was no evidence that he was a member of the Latin Kings or shared Antuna's motive. This claim is without merit. The evidence reveals that Cruz was a member of the gang and that he was a close associate of Antuna's. Moreover, the evidence demonstrates that Antuna's and Cruz's actions on the night of the murders were clearly part of a premeditated plan to accomplish a shared objective, that is, to eliminate a threat to the Latin Kings' drug trafficking. We conclude therefore that the evidence was sufficient to support a finding that Antuna and Cruz committed the A. Diaz and White murders in order to maintain or increase their positions in the Latin Kings enterprise.

### 2. Morales

Morales was charged with conspiring to murder, and aiding and abetting the murder of, Latin King Alex Aponte. On appeal, Morales argues that the murder of Aponte occurred solely because of a personal vendetta of Dante Bond, one of Aponte's murderers. Morales further contends that there was insufficient evidence to prove that he aided, abetted and conspired to murder Aponte to maintain or increase his position in the Latin Kings, as required by 18 U.S.C. § 1959(a). Morales' argument is groundless.

Taken in the light most favorable to the government, the evidence showed that on December 14, 1992, Morales authorized Latin King Michael Folch and his non-Latin King associate, Bond, to kill Aponte. At the time, Folch, Bond and Aponte sold drugs for Morales on a Latin King drug block at Yale Street in Bridgeport operated by Morales on behalf of Burgos. Folch and Bond urged the killing of Aponte because he had robbed "Eggy," a street seller on Yale Street, who fought with Bond over who was going to deal drugs on the block, and had threatened Bond's life. Since Bond was not a Latin King because he was African American, he requested Morales' permission to kill Aponte. Morales authorized Bond and Folch to murder Aponte. That night Folch and Bond went to Morales' apartment and Morales supplied them with guns. Folch and Bond later shot and killed Aponte. From this evidence, the jury could properly infer (1) that Aponte's actions posed a threat to the drug block; (2) that Morales sanctioned the murder of Aponte because it was ex-

pected of him as one of the highest ranking Latin King leaders to protect the block's drug business; and (3) that Morales' failure to do so would have undermined his leadership position within the Latin Kings. *See Thai,* 29 F.3d at 817–18; *Rosa,* 11 F.3d at 340–41. Therefore, we find there is ample evidence from which the jury could have concluded beyond a reasonable doubt that Morales participated in the murder to maintain or increase his position in the Latin Kings enterprise and to further its narcotics operations.

### F. Evidence of Morales' Conspiracy to Assault Tito and Victor Fontanez

■ Morales argues that there was insufficient evidence to support his conviction on two VICAR counts that charged him with conspiracies to assault two individuals, one known as "Green Eyed Tito" and the other named Victor Fontanez, in violation of Conn. Gen.Stat. §§ 53a–48, 53a–60. Although these VICAR counts were charged as direct violations of 18 U.S.C. § 1959(a)(6), Morales asserts that the evidence failed to show that Morales committed an "overt act" in furtherance of each conspiracy as required under Connecticut law. In addition, Morales claims that there was no evidence of "serious bodily injury" as required under § 1959(a)(6). These contentions are without merit.

First, the government is not required to prove an "overt act" under Connecticut law because the reference to violating state law in the VICAR count is only meant to indicate unlawful conduct that constitutes a predicate offense for a VICAR charge under § 1959(a)(6). *See Miller,* 116 F.3d at 675 (holding that RICO's allusion to state crimes was not intended to incorporate elements of state crimes, but only to provide a general substantive frame of reference); *Concepcion,* 983 F.2d at 380 (holding that VICAR was intended to compliment RICO); *see also Orena,* 32 F.3d at 714 (holding that VICAR indict-

ment need not allege overt act element required for state predicate crime). Second, the record reflects that there was ample evidence for the jury to conclude that Morales conspired to assault Tito and Fontanez with resulting serious bodily injury. Accordingly, we find that there was sufficient evidence to sustain Morales' § 1959(a)(6) convictions.

### G. Evidence of Morales' Aiding and Abetting the Murder of White

■ Morales also asserts that the evidence was insufficient under the *Pinkerton* theory of conspiratorial liability to support his VICAR conviction that he aided and abetted his co-conspirators, Antuna and Cruz, in the White murder. According to Morales, the fatal shots that killed White while he sat in the front passenger seat of the car were fired at close to medium range and were not actual contact shots which might indicate intentional action. Thus, he argues that there was insufficient evidence to establish his intent to murder White. We disagree.

First, there was sufficient evidence that Cruz, as he sat in the back seat of the car, fired two shots into White's head as he sat in the front seat. Second, Morales can be found guilty for a substantive crime committed by his co-conspirators without specific evidence that he committed the act charged if it is clear that the offense had been committed in furtherance of an unlawful conspiracy and that Morales was a member of that conspiracy. *See United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir.1975) (citing *Pinkerton v. United States,* 328 U.S. 640, 645, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). Here, the goal of the ongoing conspiracy was narcotics trafficking. The evidence, when viewed in the light most favorable to the government, showed that Morales was a member of the Latin Kings' drug conspiracy and that White was murdered in furtherance of it, that is, he was murdered to eliminate a potential witness to the conspiracy to murder and the murder of A. Diaz, a suspected

informant who threatened the Latin Kings' drug operations. In view of the foregoing, we find that there was sufficient evidence to support Morales' conviction.

## H. Evidence of Rios' and Cruz's Participation in the Drug Conspiracy

██ Rios and Cruz contend that the district court erroneously denied their Fed.R.Crim.P. 29 motions for judgments of acquittal because the evidence was legally insufficient to support their convictions on the drug conspiracy count. Rios and Cruz therefore argue that their RICO and RICO conspiracy counts must be reversed because such counts were based in part on the predicate racketeering act of participating in the drug conspiracy. These contentions are without merit.

██ We have recognized that since "[a] conspiracy by its very nature is a secretive operation," *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.1980), the existence of, and a particular defendant's participation in, a conspiracy may be established through circumstantial evidence. *See Gordon*, 987 F.2d at 907; *United States v. Rivera*, 971 F.2d 876, 890 (2d Cir.1992); *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992). However, "[i]n order to a prove conspiracy, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Giraldo*, 80 F.3d 667, 673 (2d Cir.1996) (internal quotation marks omitted) (quoting *United States v. Sanchez Solis*, 882 F.2d 693, 696 (2d Cir.1989) (quoting, in turn, *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir.1984))); *see Podlog*, 35 F.3d at 705. Moreover, a particular defendant's membership in a conspiracy "requires proof of purposeful behavior aimed at furthering the goals of the conspiracy." *Desimone*, 119 F.3d at 223 (citing *United States v. Torres*, 901 F.2d 205, 220 (2d Cir.1990)). Finally, we have noted that " '[o]nce a

conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming.' " *United States v. Amato*, 15 F.3d 230, 235 (2d Cir.1994) (quoting *Rivera*, 971 F.2d at 891 (quoting, in turn, *United States v. Tutino*, 883 F.2d 1125, 1129 (2d Cir.1989))).

In this case, there was more than sufficient evidence for a reasonable jury to infer that Rios and Cruz were members of the Latin Kings' drug conspiracy and that they knowingly participated in it. As to Rios, testimony of co-conspirators and prison tape recorded conversations established that he knew the existence of, and participated in, the drug conspiracy in at least two ways. First, the evidence showed that Rios orchestrated the murder of Sydney Diaz ("S.Diaz"), a one-legged drug dealer in Bridgeport, in order to eliminate him as a threat to the Latin Kings who suspected him of being an informant to the police about the gang's drug operations. Second, after S. Diaz's murder, Rios assumed control and ran the operations at S. Diaz's former drug block with other Latin Kings. As to Cruz, there was also ample evidence presented at trial that he conspired to distribute drugs. The evidence demonstrated, as noted above, that Cruz was a Latin King member, that he had sold drugs on a block run by other Latin Kings and that he conspired to murder and murdered A. Diaz, a suspected informant, in order to eliminate a threat to the gang's narcotics operations. Accordingly, we conclude that the district court properly denied their Rule 29 motions because the evidence demonstrated that Rios and Cruz were part of the charged drug conspiracy.

## I. Vidro's and Zapata's Sufficiency Claims

We have carefully considered Vidro's and Zapata's arguments regarding the sufficiency of the evidence to sustain their convictions, as discussed below, for conspiracy to murder and murder of several

persons, and we find them to be entirely without merit.

## IV. Jury Instructions

Defendants-appellants Rios, Vidro and Zapata contend that the district court's jury instructions were erroneous for several reasons. Their contentions lack merit.

### A. Denial of "Withdrawal from the Conspiracy" Instruction

■ In 1992, after Rios murdered S. Diaz and took over S. Diaz's drug block, he was incarcerated. Rios contends that his incarceration, and his testimony that he was not involved in the nefarious activities of the Latin Kings upon his release from jail in 1994, constituted withdrawal from the charged conspiracy. Rios therefore asserts that the district court erred by refusing to give the jury an instruction on withdrawal from the conspiracy. We disagree.

■ "A criminal defendant 'is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be.'" *Salameh*, 152 F.3d at 150 (quoting *United States v. LaMorte*, 950 F.2d 80, 84 (2d Cir.1991)). To support a withdrawal defense, a defendant "would have to prove some act that affirmatively establish[es] that he disavowed his criminal association with the conspiracy and that he communicated his withdrawal to the co-conspirators." *United States v. Minicone*, 960 F.2d 1099, 1108 (2d Cir.1992) (citations omitted). "Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995) (internal quotation marks and alteration omitted) (quoting *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir.1976)).

We have recognized that "[a] conspirator who presents evidence of his imprisonment during the course of the conspiracy is entitled to a jury instruction on withdrawal." *Salameh*, 152 F.3d at 150 (citing *Panebianco*, 543 F.2d at 453). The issue of whether a conspirator's incarceration establishes withdrawal from the conspiracy "must be decided by the jury in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence." *Panebianco*, 543 F.2d at 454 n. 5. Here, since Rios was imprisoned in 1992 during the course of the charged conspiracy (which covered the period from November 1991 to the filing of the indictment in 1994), he was entitled to a jury instruction on withdrawal. Nevertheless, we find that the district court's refusal to instruct the jury on such a defense was harmless error and did not result in any prejudice to Rios.

■ Rios claims his imprisonment in 1992 constitutes evidence of his withdrawal from the conspiracy. His incarceration, however, took place after he committed the S. Diaz murder and engaged in drug trafficking for the Latin Kings, which were crimes that formed the basis of his racketeering and narcotics convictions in this case. Second, Rios has failed to carry his burden of proving withdrawal because "[n]either authority nor reason would suggest that imprisonment necessarily shows a withdrawal." *United States v. Borelli*, 336 F.2d 376, 389 (2d Cir.1964); *see United States v. Agueci*, 310 F.2d 817, 839 (2d Cir.1962) ("[W]hile ... incarceration *may* constitute a withdrawal from a conspiracy, it does not follow that in every instance it *must.*"). Other than his incarceration, Rios did not present any affirmative evidence at trial or on appeal to demonstrate that he withdrew from the conspiracy after his incarceration. In fact, the government presented ample evidence that Rios' conduct, from his incarceration in 1992 to his release in 1994 and thereafter, showed that he continued to be involved in the conspiracy. The evidence demonstrated that Rios retained a leadership position within the Latin Kings while in jail. Moreover, upon

his release, the evidence established that Rios attended Latin King meetings and had telephone conversations with Millet and other Latin King members about the gang's drug business.

 Finally, even if the jury believed that Rios had withdrawn from the conspiracy in 1992, he suffered no prejudice from the lack of a withdrawal instruction to the jury. We have recognized that where there is substantial evidence of a defendant's participation in the conspiracy prior to incarceration, "the significance of his withdrawal relates only to the improper use against him of subsequent acts and declarations of coconspirators." *Agueci*, 310 F.2d at 839. In this case, the government did not seek to hold Rios liable for the criminal acts of his co-conspirators committed after his incarceration, such as the double homicide of A. Diaz and White. Moreover, the district court carefully instructed the jury that they could not use a May 1994 conversation between Millet and a Latin King member against Rios. In addition, the court charged the jury on the issue of withdrawal, as well as the admissibility of the acts and declarations of his co-conspirators, thus sufficiently protecting Rios from improper use of such evidence against him.

## B. Vidro's and Zapata's *Pinkerton* Liability for Several Murders

Vidro and Zapata were charged with (1) conspiring to murder Ricky Reyes and murdering Jesse Council; (2) conspiring to murder and murdering David Valedon; and (3) murdering Sammy Calo, Jr. and Edwin Villafane. Vidro and Zapata argue (1) that the district court erroneously instructed the jury that they could find Vidro and Zapata guilty under the *Pinkerton* theory of conspiratorial liability; and (2) the court erred by failing to look to state law to determine the propriety and language of the *Pinkerton* instruction. We disagree.

### 1. *Pinkerton* Liability Instruction

 We have held that under the *Pinkerton* co-conspirator doctrine, as noted in our discussion of Morales' sufficiency claim above, a jury may find "a conspirator can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if [the conspirator] did not himself participate in the substantive crimes." *Salameh*, 152 F.3d at 151. "Whether a particular crime is foreseeable and in furtherance of the conspiracy is a factual matter for the jury." *United States v. Romero*, 897 F.2d 47, 51 (2d Cir.1990).

 With respect to the Council murder, the evidence, when taken in the light most favorable to the government, showed the following facts. On June 6, 1992, Reyes shot a Latin King associate. After learning of the shooting, Vidro, as President of the Latin Kings' New Haven chapter, held a meeting and issued a standing order to kill Reyes. On June 25, 1992, after Reyes shot another Latin King member, Vidro held an emergency meeting and ordered that Latin King members James Flynn, Edwin Ortiz and Raul Torres drive to Reyes' drug spot on Asylum Street in New Haven and kill Reyes that night. Zapata and Burgos provided multiple guns for the mission. As a result, Torres drove Flynn and Ortiz over to Asylum Street where they began shooting up the street. Afterwards, Flynn and Ortiz ran back to where Torres was waiting in the car and drove off. Flynn killed Council, an innocent bystander, with Zapata's gun during his attempt to kill Reyes. Shortly thereafter, Vidro then directed one of the three Latin King soldiers to put the murder weapons in her backyard. On July 2, 1992, New Haven police executed a search warrant of Vidro's residence and recovered the firearms that were used in the Council murder.

Thus, the evidence clearly established that Vidro and Zapata entered into a con-

spiracy to murder Reyes. Moreover, the factors involved in the Council murder (the decision to murder Reyes on a public street, the use of multiple firearms, the perpetration of the order through a drive-by shooting, and the haste in carrying out the murder), make it clear that the killing of someone other than Reyes was reasonably foreseeable. Therefore, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that Vidro and Zapata were responsible for Council's murder under the *Pinkerton* theory of conspiratorial liability. *See, e.g., United States v. Alvarez,* 755 F.2d 830, 849–50 (11th Cir.1985) (expanding *Pinkerton* liability to include "reasonably foreseeable but originally unintended substantive crimes").

■ With respect to the triple homicide of Valedon, Calo and Villafane, the evidence, when taken in the light most favorable to the government, demonstrated the following facts. Vidro ordered the murder of Latin King Valedon because he disrespected her and threatened to join a rival gang. Vidro chose Zapata and Latin King Eddie Hernandez to assist her. Hernandez was the armed lieutenant for Vidro's and Zapata's drug operations. On October 13 and 14, 1992, Zapata and Hernandez lured Valedon and his Latin King friends Calo and Villafane to East Rock Park in New Haven where they shot and killed each of them, execution style. We conclude that this evidence was sufficient for a jury to have found beyond a reasonable doubt that Vidro and Zapata conspired to murder Valedon and that his murder was a reasonably foreseeable consequence of the conspiracy. Further, we conclude that under the facts of the case, it was reasonably foreseeable that others besides Valedon might be killed, such as his friends, Calo and Villafane.

We conclude that the district court properly instructed the jury that it could find Vidro and Zapata liable for the four homicides under the *Pinkerton* co-conspirator doctrine.

### 2. Propriety of a *Pinkerton* Instruction Under State Law

■ Vidro and Zapata claim that the district court was obliged to look to Connecticut law to determine the propriety and language of a *Pinkerton* instruction. This argument is meritless. As noted above, the racketeering statutes are not meant to incorporate state procedural and evidentiary law; rather, references to state law in these statutes merely serve a definitional purpose, that is, to identify generally the kind of conduct made illegal by the federal statute. *See Coonan,* 938 F.2d at 1564; *Paone,* 782 F.2d at 393. Therefore, the court was not required to consider state law in its *Pinkerton* instruction.

### C. Lesser Included Offense Instruction

■ Zapata requested at the charging conference that the district court instruct the jury on manslaughter as a lesser included offense for all the alleged murders in the case. As part of that instruction, Zapata asked the court to instruct the jury that if they found a defendant guilty of manslaughter, they must find him not guilty of the corresponding VICAR offense because manslaughter is not included among the crimes enumerated in the VICAR statute, 18 U.S.C. § 1959. Zapata therefore claims that the court's refusal to give the requested lesser included offense instruction on manslaughter for the Council murder is reversible error because the jury could have found that the Latin King shooters who killed Council acted recklessly instead of intentionally. This claim is without merit.

■ Fed.R.Crim.P. 31(c) permits a jury to return a verdict of guilty as to "an offense necessarily included in the offense charged." In *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Supreme Court explained

that a court should apply an "elements" test to determine whether a lesser-included-offense instruction is proper under Rule 31(c). *See id.* at 716, 109 S.Ct. 1443. Under this test, a defendant is entitled to a lesser-included offense instruction under federal law only if (1) the elements of the lesser offense are a subset of the elements of the charged offense, *see id.; United States v. Hourihan,* 66 F.3d 458, 464–65 (2d Cir.1995); and (2) the evidence at trial permits a rational jury to find the defendant guilty of the lesser offense and acquit him of the greater, *see Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973).

In determining, under the first prong of the test, whether an offense constitutes a lesser-included offense of the charged offense, we compare "the statutory elements of the offenses in question, and not ... [the] conduct proved at trial." *Schmuck,* 489 U.S. at 716–17, 109 S.Ct. 1443. Therefore, regardless of the evidence adduced at trial, "[w]here the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)." *Id.* at 716, 109 S.Ct. 1443.

In this case, all of the homicides were charged as either racketeering acts of murder under the RICO statute, *see* 18 U.S.C. § 1962(c), or murders in aid of racketeering under the VICAR statute, *see* 18 U.S.C. § 1959(a). Murder under either statute, however, is not simply a federalized version of the state crime. Rather, it is a distinct substantive offense that requires proof of its own particular elements. As such, under the elements test, manslaughter is not a lesser included offense of RICO and VICAR murder under federal law. Therefore, the district court properly declined to provide a lesser-included offense instruction for manslaughter.

## D. Reasonable Doubt Instruction

E. Rodriguez requested that the district court give the jury an instruction defining "reasonable doubt" to include the phrase: "a reasonable doubt may arise not only from evidence produced, but also from a lack of evidence." Instead, the district court charged the jury in accordance with the pattern instruction contained in § 12.10 of 1 Devitt & Blackmar, *Federal Jury Practice and Instructions* (4th ed.1992), that did not contain the "lack of evidence" provision. Relying on jury charges given in New York and Connecticut state courts that include such a provision, E. Rodriguez argues that the court's refusal to charge the jury on his proposed instruction defining reasonable doubt deprived him of a fair trial and due process of law and, therefore, constituted reversible error. We disagree.

It is irrelevant that defendants in state courts in this jurisdiction, such as Connecticut and New York, are given a reasonable doubt charge that includes the term "lack of evidence" or "lack or insufficiency of the evidence," while defendants in federal courts are charged differently. We have recognized that "[a]lthough application of the reasonable-doubt standard in criminal cases is required as a matter of due process, 'the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.'" *Desimone,* 119 F.3d at 226 (quoting *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994)). Indeed, because of the difficulty inherent in trying to articulate an acceptable definition of reasonable doubt for the jury, several circuits, including this one, generally discourage district courts from trying to define the term. *See id.* Therefore, a district court's failure to define reasonable doubt cannot, by itself, constitute reversible error. *See id.* at 227.

Even if a failure to include the "lack of evidence" term could be construed as error, we examine the jury instructions as a whole, *see Vargas v. Keane,* 86 F.3d 1273, 1277 (2d Cir.1996) (citing *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)), to "assess

'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet' the standard of proof beyond a reasonable doubt." *Id.* (quoting *Victor,* 511 U.S. at 6, 114 S.Ct. 1239); *see Desimone,* 119 F.3d at 227; *United States v. Birbal,* 62 F.3d 456, 462 (2d Cir.1995). We have further noted that "an asserted error in a reasonable doubt instruction may be innocuous or inconsequential when viewed in context of the charge as a whole." *Vargas,* 86 F.3d at 1277.

Here, it was not likely that the jury understood the district court's instruction on reasonable doubt to mean it could convict based on insufficient proof. We find that the court's use of the model instruction in § 12.10 of Devitt & Blackmar "correctly conveyed the concept of reasonable doubt to the jury." *Victor,* 511 U.S. at 22, 114 S.Ct. 1239 (internal quotation marks omitted); *see also United States v. Ivic,* 700 F.2d 51, 69 (2d Cir.1983) (approving of same instruction, formerly § 11.14 of Devitt & Blackmar (3d ed.1977)); *see also Birbal,* 62 F.3d at 459–60 (noting a district court's failure to heed this Court's "repeated warnings against embellishing upon the standards recommended in 1 Devitt & Blackmar" (quoting *United States v. Delibac,* 925 F.2d 610, 614 (2d Cir.1991) (per curiam))). Moreover, when viewing the charges as a whole, the record reflects that the court referred to the concept of reasonable doubt at least eighteen times throughout the charge, that it charged the jury on four additional occasions that its verdict "must be based solely upon the evidence developed at trial or the lack of evidence," and that, at one point, it instructed the jury that "[y]our concern ... is to determine whether or not on the evidence or lack of evidence the defendant's guilt has been proven beyond a reasonable doubt." Accordingly, we conclude that E. Rodriguez was not prejudiced by the court's failure to define reasonable doubt with the "lack of evidence" term.

## V. Other Contentions

Defendants-appellants' other contentions include challenges to a variety of procedural and evidentiary rulings. None of their contentions has merit; only the following warrant discussion.

### A. Severance

Morales, Rios and Roman argue that the district court abused its discretion in denying their motions for severance, thereby depriving them of a fair trial. To support their claims of lack of due process: (1) Roman contends he suffered spillover prejudice from the admission of evidence concerning his co-defendants' acts of violence and other criminal activities; (2) all three claim prejudice from antagonistic or hostile defenses by co-defendants; and (3) Roman argues that jury confusion resulted from the length and complexity of the trial. These severance claims are without merit.

There is a preference, in the federal system, for defendants who are indicted together to be tried together. *See Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *Salameh,* 152 F.3d at 115. The decision to sever a joint trial of federal defendants is "committed to the sound discretion of the trial judge." *United States v. Casamento,* 887 F.2d 1141, 1149 (2d Cir.1989). Considered "virtually unreviewable," *Miller,* 116 F.3d at 679 (quoting *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir. 1988)), a district court's denial of a severance motion under Fed.R.Crim.P. 14 will be reversed only if a defendant can "show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion," *Rosa,* 11 F.3d at 341 (citations omitted). To show an abuse of discretion, a defendant "must demonstrate that the denial of the motion caused substantial prejudice," *Casamento,* 887 F.2d at 1150, that is, prejudice so severe as to amount to a denial of a constitutionally fair trial, *see United States v. Cardascia,* 951

F.2d 474, 482 (2d Cir.1991). "If the denial of the motion causes some prejudice, but less than substantial prejudice, we are not apt to reverse, since, by and large, joinder promotes judicial efficiency." *Casamento*, 887 F.2d at 1150.

### 1. Alleged Spillover Prejudice

■ Roman argues that admission of evidence concerning alleged crimes by his co-defendants caused him "substantial" spillover prejudice which could have been avoided by a separate trial. Roman principally notes that although he was only implicated in one of nine murders charged (that of Robinson), he was tried over a three month period before the same jury which heard volumes of evidence that his co-defendants, *inter alia*, committed eight unrelated murders and other acts of violence, sold narcotics, and maintained and shared weapons for use in their criminal activities. He contends that since this evidence was introduced only to prove the existence of the Latin Kings organization, to which he already conceded, its spillover effect was highly prejudicial and, therefore, warrants a reversal of his conviction. We find there was no "substantial" spillover prejudice here to constitute a "miscarriage of justice."

First, the evidence in dispute is relevant to the charges against all RICO defendants because it tended to prove (1) the existence and nature of the Latin Kings and their RICO enterprise; and (2) a pattern of racketeering activity on the part of each RICO defendant by providing the requisite relationship and continuity of illegal activities. *See, e.g., DiNome*, 954 F.2d at 843–44 (holding that there was no prejudicial spillover effect because contested evidence was relevant to RICO charges and would have been admitted against all defendants); *Brady*, 26 F.3d at 287 (holding that there was no prejudice from admission of evidence regarding murders as background evidence). Therefore, such evidence would have been admissible against all of these defendants even if each

had been tried separately. *See Miller*, 116 F.3d at 679; *Rosa*, 11 F.3d at 341; *DiNome*, 954 F.2d at 844. Even though some of this evidence came in the form of statements from Roman's co-conspirators, tape recorded or otherwise, including statements that were made prior to Roman's joining of the Latin Kings, the result is the same. Such evidence was properly admitted against Roman pursuant to Fed. R.Evid. 801(d)(2)(E) as statements in furtherance of the charged racketeering and drug conspiracies. *See United States v. Badalamenti*, 794 F.2d 821, 826–28 (2d Cir.1986).

Further, the district court gave limiting instructions to the jury during the trial and in its final jury charges to assess the evidence against each defendant separately from the evidence presented against other defendants. *See United States v. Carson*, 702 F.2d 351, 367 (2d Cir.1983) (holding that a judge's instructions to the jury to assess each defendant separately supports a finding of no spillover prejudice). The verdict against Millet, which included acquitting him of one VICAR count and one predicate act of racketeering of the RICO count, indicates that the jury heeded the court's instructions and carefully considered the evidence against each defendant separately. Because Roman has not shown that his joint trial substantially prejudiced him, we find that the district court did not abuse its discretion in denying his severance motions.

### 2. Antagonistic Defenses

■ Morales, Rios and Roman argue that because of the antagonism or hostility between their defenses, the district court abused its discretion by not granting their motions for severance and mistrial. Specifically, Rios contends that his defense of not being responsible for the murder of S. Diaz was prejudiced by Morales who testified that Rios "killed" S. Diaz. Likewise, Roman and Morales assert that they were prejudiced by Rios who testified that "Roman and . . . Morales was [sic] trying to

kill me." Morales claims that he suffered prejudice because the remark refuted his defense that he was not responsible for any homicides. Roman does not claim that Rios' remark was antagonistic to his defense. Rather, Roman claims that because he investigated the murder of S. Diaz as Chairman of the Latin Kings, there was hostility between him and Rios and that this hostility showed when Rios testified during cross-examination, prejudicing Roman at trial. We find no prejudice here warranting reversal.

 Even if prejudice is shown, or there are antagonistic or hostile defenses, severance is not necessarily required. *See United States v. Beverly,* 5 F.3d 633, 637–38 (2d Cir.1993). Rather, "the tailoring of the relief to be granted, if any, [is left] to the district court's sound discretion." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.; see United States v. Haynes,* 16 F.3d 29, 32 (2d Cir.1994). However, even when the risk of prejudice is high, measures less drastic than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933.

In the present case, the district court sufficiently cured any prejudice to Rios by (1) giving a limiting instruction to the jury on the proper consideration of Morales' blurted statement that Rios killed S. Diaz; (2) cautioning Morales for giving similar testimony; (3) striking comparable testimony and instructing the jury to disregard it; and (4) giving the jury cautionary instructions in its final jury charge on how to treat inadmissible evidence inadvertently presented to it. Furthermore, the overwhelming evidence introduced at trial permits the conclusion that Rios would have been convicted absent Morales' testimony. Thus, we find that Morales' remark did not substantially prejudice Rios. *See, e.g.,*

*United States v. Marshall,* 458 F.2d 446, 452 (2d Cir.1972) (holding that prejudice from spillover was too speculative); *United States v. Rivera–Gomez,* 67 F.3d 993, 999–1000 (1st Cir.1995) (holding that curative instructions along with strength of government's case and limited scope of spillover did not prejudice defendant).

 As to Rios' testimony that Roman and Morales tried to kill him, Morales moved for mistrial, but he failed to ask for a limiting instruction or have the testimony stricken. Further, Morales did not object to Rios' direct testimony on the same point, and he elicited similar testimony when he cross-examined Rios. Such actions or lack thereof by Morales do not support a finding of prejudice. *See Brady,* 26 F.3d at 288–89; *United States v. Calabro,* 467 F.2d 973, 987–88 (2d Cir.1972).

 Similarly, Roman did not offer substantive facts to support a showing that his joinder with Rios compromised a specific trial right or prevented the jury from making a reliable judgment about his guilt or innocence. As such, mere "hostility" between Roman and Rios does not warrant severance. *See Casamento,* 887 F.2d at 1153–54. We therefore find that the district court did not abuse its discretion in denying these motions for severance and mistrial.

### 3. Length and Complexity of Trial

 Roman argues that, because of the length of trial, the complexity of factual and legal issues, and the large number of defendants, witnesses and crimes charged, the jury was prevented from adequately remembering and evaluating the evidence and failed to give individual consideration to each defendant. Thus, Roman claims that the district court's refusal to sever the Millet Trial caused significant jury confusion and thereby deprived him of a fair trial. We disagree.

First, Roman fails to make a "showing that the issues were actually beyond the jury's competence." *DiNome,* 954 F.2d at

842. Although the jury had to evaluate an extensive amount of evidence, the nature of the evidence and legal issues involved in this case could be understood without difficulty. *See, e.g., Casamento,* 887 F.2d at 1150 (holding that the jury had no difficulty in grasping "the legal significance of shipment of narcotics, sales of narcotics, and transfer of money."). The conclusion that the jury comprehended the case is supported by several factors, including jurors taking notes during trial, the requests for readbacks of testimony and the length of the deliberations. *See, e.g., DiNome,* 954 F.2d at 843. In addition, the district court carefully instructed the jury to consider the evidence against each defendant independently. Finally, the jury verdict itself, where Millet was acquitted on one of the VICAR counts, is a clear "indication that the jury was able to sift through voluminous evidence and differentiate among various defendants." *Casamento,* 887 F.2d at 1150. We therefore conclude that Roman's allegation of jury confusion has no merit.

## B. Denial of Roman's Motion for a New Trial

On March 24, 1997, the government received a copy of a March 12, 1997, affidavit of Carmen Miranda, that was submitted in an unrelated case, *United States v. Cintron,* Crim. No. 3:95cr135(PCD). The government disclosed the affidavit to defense counsel in this case immediately thereafter. In her affidavit, Miranda alleged (1) that M. Soto committed perjury when she testified during the Millet Trial; and (2) that Rafael Segarra, a New Haven police detective who allegedly participated in the investigation of the Latin Kings, knew of this fact. Specifically, Miranda claimed in her affidavit that she was present when M.

Soto told Detective Segarra that she would not reveal at trial that L. Rodriguez participated in the murder of Jonathan Thomas, a murder not charged in Roman's case.[12] Miranda also alleges in her affidavit that Detective Segarra knowingly suborned M. Soto's perjured testimony and that he had developed a sexual relationship with M. Soto during Roman's trial. In addition, Miranda testified during the *Cintron* case that she heard M. Soto state that, although she knew L. Rodriguez had something to do with the murder of Thomas, she did not give out the information to law enforcement; rather, M. Soto only told the government what was convenient in response to questions about L. Rodriguez during the Millet Trial. Miranda also testified that M. Soto withheld information on L. Rodriguez because she was dating him at the time.

Relying on Miranda's affidavit, Roman moved for a new trial in April 1997 under Fed.R.Crim.P. 33. First, Roman asserted that because Detective Segarra knew about M. Soto's perjury and that he was part of the prosecution team, his knowledge of the perjury was therefore imputed to the prosecution. Thus, Roman claimed that the prosecution knowingly used perjured testimony during his trial, but failed to inform him or the court about it. This failure denied him the opportunity to cross-examine M. Soto, a key government witness against him regarding the Robinson murder,[13] thereby warranting a new trial. Second, Roman claimed that the government violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for it failed to disclose exculpatory information to him regarding Detective Segarra's contacts and relationship with M. Soto.

12. Thomas was murdered on April 4, 1994. L. Rodriguez was charged with this murder in state court and was later acquitted after a trial in September 1995.

13. Roman also claimed that M. Soto was a key witness against him concerning the conspiracy to murder Mojica and the district court found that M. Soto's testimony was abundantly corroborated in that regard. Because Roman does not challenge the sufficiency of the evidence supporting his conviction for conspiring to murder Mojica, we do not address M. Soto's testimony regarding Mojica.

For purposes of considering Roman's motion for a new trial, the district court assumed that Miranda's affidavit constituted newly discovered evidence and that it showed M. Soto committed perjury at trial. Roman contends that the court erroneously denied his motion by finding (1) that there was no basis for imputing Detective Segarra's purported knowledge to the government because he only had an incidental role in the prosecution; (2) that evidence of M. Soto's perjury was cumulative and immaterial; (3) that M. Soto's testimony about Roman's role in the Robinson murder was fully corroborated; and (4) that the prosecution had not violated its *Brady* obligations. We disagree.

### 1. Newly Discovered Evidence

A motion for a new trial based on newly discovered evidence is "not favored," and a district court "must exercise great caution ... and may grant the motion only *in the most extraordinary circumstances*," *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993) (internal quotation marks omitted), where it is required in the interest of justice, Fed.R.Crim.P. 33. We will not reverse a district court's findings of fact concerning a motion for a new trial unless they are clearly erroneous; nor will we overturn the denial of such a motion unless there has been an abuse of discretion. *See United States v. Diaz*, 922 F.2d 998, 1006–07 (2d Cir.1990).

Newly discovered evidence does not warrant a new trial unless the defendant shows that: (1) the " 'newly discovered evidence' could not with due diligence have been discovered before or during trial"; (2) where the claim is that the evidence shows perjury by a prosecution witness, the evidence "demonstrates that the witness in fact committed perjury"; (3) the evidence is "material" to the jury's verdict, that is, relevant to the merits of the case; (4) the evidence is not "cumulative" of other evidence introduced at trial as to a fact; and (5) the evidence could have affected the jury's verdict if it

had been introduced at trial. *United States v. White*, 972 F.2d 16, 20–21 (2d Cir.1992). If the newly discovered evidence indicates that perjured testimony was given at trial, the affect of such evidence on the verdict depends on whether the prosecution was aware of that perjury. *See id.* at 21; *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991).

There are two standards of review on whether the prosecution was aware of the perjury. *See White*, 972 F.2d at 21. First, if the prosecution knew or should have known of that perjury, a new trial must be granted "if the court determines that new evidence 'might' alter the verdict of the jury." *Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir.1988). The test is whether there is any "reasonable likelihood" that the perjured testimony could have influenced the jury. *See Wallach*, 935 F.2d at 456. Second, "[i]f the prosecution was unaware of the perjury, a new trial is warranted if the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *See White*, 972 F.2d at 21 (internal quotation marks and alternation omitted).

On appeal, Roman argues that because the district court erroneously rejected his contention that Detective Segarra's knowledge of M. Soto's perjury should be imputed to the prosecution, it applied the wrong standard of review in denying his motion, that is, the court incorrectly employed the standard applicable when the prosecution is not aware of alleged perjury. We find this claim is without merit.

First, the only evidence that support's Roman's claim that Detective Segarra knew of M. Soto's perjury is Miranda's affidavit. In his own affidavit, however, Detective Segarra (1) denied that M. Soto told him anything about the substance of her testimony either before or after the Millet Trial; and (2) denied having a sexual relationship with M. Soto until after Roman's trial.

Even if we assume that Detective Segarra knew of M. Soto's perjury, there is no basis to impute his knowledge to the prosecution. Based on affidavits submitted by two FBI agents who were in charge of the federal, state and local Task Force that investigated the Connecticut Latin Kings, the district court found (1) that Detective Segarra was not a member of the Task Force; (2) as a local police officer assigned to assist the Task Force, Detective Segarra monitored wiretaps in April, May, and June, 1994, participated in arrests made in June 1994, and conducted surveillance during the investigation; and (3) that after Roman's arrest in June 1994, he returned to his role as a local police officer and had no other role in the investigation leading up to the indictment and subsequent prosecution of Roman. The court also found that after Detective Segarra informed the FBI that M. Soto wanted to talk to them in April 1994, he did not become involved in M. Soto's subsequent cooperation with the government nor was he assigned to her in connection with the investigation and prosecution of the Latin Kings. The court further noted that Detective Segarra did not act as a witness for or assist the prosecution during Roman's trial. Therefore, based on the limited scope of his actions, the district court concluded that Detective Segarra's purported awareness of M. Soto's perjury, if any, could not be imputed to the prosecution.

Additionally, the district court found that M. Soto's alleged perjury was unrelated to any of the crimes with which Roman or his co-defendants were charged; rather, her purportedly false testimony only concerned L. Rodriguez's supposed murder of Thomas, a crime which had no connection to the merits of Roman's case. Because this alleged newly discovered evidence failed to refute any of M. Soto's testimony against Roman, the district court found that it was immaterial. *See Spencer,* 4 F.3d at 119 (noting that "[t]he discovery of new evidence which merely discredits a government witness and does not directly contradict the government's case ordinarily does not justify the grant of a new trial.") (internal quotation marks omitted and alteration in original).

Next, the district court concluded that M. Soto's alleged perjury relating to the Thomas murder was merely additional impeachment material against her credibility. The impeachment evidence presented at trial, *inter alia,* included (1) the testimony of her brother, Mike Soto, that L. Rodriguez killed Thomas; and (2) defense counsels' extensive cross-examinations of M. Soto, during which she (a) acknowledged her relationship with L. Rodriguez, and (b) was portrayed by defense counsel as cooperating with the government to protect L. Rodriguez from liability for his alleged role in the Robinson and Thomas murders. In addition, Roman's summation attacked the credibility of M. Soto and the court also carefully instructed the jury on examining a witness' credibility where there is a grant of immunity. *See United States v. Gordils,* 982 F.2d 64, 72 (2d Cir.1992) (affirming denial of Rule 33 motion where impeachment evidence was cumulative).

Finally, the district court concluded that, although M. Soto was the only government witness in a position to testify that Roman ordered the Robinson murder, there was an abundance of evidence that corroborated M. Soto's description of these events. In sum, the district court found that the newly discovered evidence of M. Soto's alleged perjury (1) could not be imputed to the prosecution; (2) was immaterial and cumulative; and (3) was fully corroborated in connection with the Robinson murder.

Having reviewed the record, we find that the district court's factual findings were supported by the evidence and were not clearly erroneous. We agree with the court's finding that Detective Segarra's purported knowledge of M. Soto's perjury could not be imputed to the prosecution. We do not believe that "but for" M. Soto's perjured testimony, Roman would most likely not have been convicted. On the contrary, the record supports the court's

conclusion that there was an abundance of independent evidence of Roman's guilt, including his participation in the Robinson murder. *See United States. v. Wong,* 78 F.3d 73, 82 (2d Cir.1996) (recognizing that "where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial."). Accordingly, we conclude that the court did not abuse its discretion in denying Roman's first claim for a new trial.

### 2. Alleged *Brady* Violations

Roman asserts that the government violated the disclosure requirements of *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, by failing to disclose the following three items of information that could have been used to impeach M. Soto: (1) the fact that it was Detective Segarra, not M. Soto herself, who made the first contact between his then 'neighbor' M. Soto and the FBI; (2) Detective Segarra's alleged presence at an FBI de-briefing of M. Soto in April 1994; and (3) the time period when a sexual relationship developed between Detective Segarra and M. Soto. On appeal, Roman argues that non-disclosure of these items warrants a new trial. Again, we disagree.

 In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* Thus, a new trial is warranted under *Brady* where the government suppressed favorable evidence, *see Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), including favorable impeachment evidence, and the suppressed evidence was material, *see United States v. Amiel,* 95 F.3d 135, 144–45 (2d Cir.1996). Suppressed evidence is material generally if " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375). Suppressed impeachment evidence is "material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *Wong,* 78 F.3d at 79 (internal quotation marks and citations omitted, alteration in original) (quoting *United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir.1995)). However, suppressed impeachment evidence is not material where the new evidence merely constitutes "an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Payne,* 63 F.3d at 1210.

 With respect to Roman's first claim, we need not decide whether Detective Segarra's referral of M. Soto to the FBI was suppressed evidence because the mere referral of a witness to authorities does not constitute favorable impeachment evidence under *Brady* and, therefore, is immaterial. *See United States v. Gambino,* 59 F.3d 353, 366–67 (2d Cir.1995) (holding where evidence is not material, court need not address whether or not the evidence was suppressed). Even if we assume this evidence was of some impeachment value, it merely constituted cumulative impeachment material because Roman was able to cross-examine M. Soto extensively about the timing of her decision to cooperate and her reasons for such cooperation. *See Locascio,* 6 F.3d at 949–50 (affirming denial of a new-trial motion without an evidentiary hearing where newly discovered reports would merely have been cumulative impeachment material against a witness' credibility).

Roman's second claim—that Detective Segarra was purportedly present at an FBI interview of M. Soto—does not constitute a *Brady* violation at all because the record clearly reflects that Detective Segarra was not present at any government debriefing of M. Soto and, therefore, there was no such information to suppress. Similarly, failure to disclose Detective Segarra's romantic relationship with M. Soto was not a *Brady* violation because the relationship did not occur until after Roman's trial; thus, the evidence could not have been suppressed by the prosecution during trial. Since only Roman's first claim raised a possible issue under *Brady*, which we found to be immaterial, our confidence in the outcome of the trial is not undermined. Accordingly, the district court did not abuse its discretion in rejecting Roman's *Brady* claims and denying him a new trial.

## C. Denial of Roman's Motion to Suppress Wiretap Evidence

Prior to trial, Roman moved to suppress evidence obtained through use of court-authorized wiretaps, contending that the application and supporting affidavits (collectively the "Affidavit") (1) contained stale information; (2) failed to establish probable cause; and (3) failed to establish the inadequacy of other investigative procedures. The district court referred his motion to United States District Judge T.F. Gilroy Daly, who denied it. Roman argues that the district judge erred in denying his motion. We disagree.

"In reviewing a ruling on a motion to suppress wiretap evidence, we accord deference to the district court." *Miller*, 116 F.3d at 663 (quoting *Torres*, 901 F.2d at 231). Our role in reviewing the issuance of a wiretap order is not to make a *de novo* determination of the sufficiency of the application, "but to decide if the facts set forth in the application were minimally adequate to support the determination that was made." *Id.* Here, we find that the Affidavit adequately supported the district judge's denial of Roman's motion.

### 1. Affidavit's Information

Roman argues that the Affidavit contained stale information and did not make the necessary connection between his home phone and the offenses under investigation. We previously have held that " 'the principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law.' " *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir.1988) (quoting *United States v. Martino*, 664 F.2d 860, 867 (2d Cir.1981)). Where a supporting affidavit presents "a picture of continuing conduct as opposed to an isolated instance of wrongdoing. Thus, the passage of time between the last described act and the presentation of the application become less significant." *Id.* (internal quotation marks and citation omitted). This is especially true in a case involving an ongoing narcotics operation, where "intervals of weeks or months between the last described act and the application" for a wiretap do not necessarily make the information stale. *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir.1991) (dealing with search warrants) (citing *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir.1990) (holding that gap of 18 months did not render information stale); *Martino*, 664 F.2d at 867 (3 weeks); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985) (5 weeks)).

Here, the district judge properly concluded that the Affidavit did not contain stale information. First, the Affidavit stated that Roman and other members of the Latin Kings (1) were involved in drug trafficking activities as late as March 1994, within one month of the wiretap application; (2) used telephones to conduct their illegal drug activities; and (3) that Roman's phone was used to make calls to and receive calls from these individuals until March 1994. Moreover, as the district judge found, to the extent that

there are acts of past criminal activity that in and of themselves might be stale, such acts "can be sufficient if [an] affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir.1993).

## 2. Probable Cause

 Roman further argues that the Affidavit failed to establish probable cause that particular communications concerning criminal activity would be obtained by tapping his home phone. Again, the Affidavit belies this contention.

 To the extent pertinent here, a federal court may issue a wiretap order under 18 U.S.C. § 2518 if it determines, on the basis of the facts submitted by the applicant, that there is probable cause to believe (1) that an individual was committing, had committed, or is about to commit a crime; (2) that communications concerning that crime will be obtained through the wiretap; and (3) that the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap. *See* 18 U.S.C. § 2518(1)(b)(i), (3)(a), (b), (d) (1988). The standard for probable cause applicable to § 2518 is "the same as the standard for a regular search warrant." *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.1977). Under *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), probable cause for a search warrant is established if the "totality-of-the-circumstances" indicate a probability of criminal activity. *See id.* at 230–32, 103 S.Ct. 2317. On appellate review, a determination of probable cause is accorded "great deference," and will be upheld so long as the magistrate or judge "had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." *Id.* at 236, 103 S.Ct. 2317 (alteration in original); *see Wagner*, 989 F.2d at 72.

In the case before us, there existed a "substantial basis" that wiretaps of Roman's home phone would uncover evidence of unlawful activity. The Affidavit stated, and Roman does not dispute, that he and other members of the Latin Kings were engaged in drug trafficking within Bridgeport and New Haven. Moreover, the Affidavit contained a detailed account of how Roman and the key Latin King members conducted their illegal activities over the target phones, and set forth specific instances where Roman used his home phone in this regard. Further, the district judge found that contrary to Roman's claim of no "unusual criminal pattern," the pen register[14] analysis showed that, exclusive of calls to known family members or social acquaintances, Roman's home phone was used extensively to call other Latin Kings whom the Affidavit listed as engaged in drug trafficking and related criminal activities. Considering the totality of these circumstances, the issuance of the wiretap order was certainly justified. Accordingly, the district judge properly found probable cause.

## 3. Inadequacy of Other Investigative Procedures

 Roman also contends that the Affidavit failed to establish another prerequisite for the issuance of a wiretap order, to wit, that other investigative techniques had been tried and failed or appeared too dangerous or unlikely to succeed. *See* 18 U.S.C. § 2518(1)(c). Specifically, Roman asserts that because the government had access to the Lompoc prison tape recordings and had ample confidential informants, the government failed to make the requisite statutory showing that it exhausted other investigative procedures. We disagree.

14. *See United States v. New York Tel. Co.*, 434 U.S. 159, 167, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (clarifying that pen registers are mechanical devices that determine the numbers called from a telephone, but do not acquire the contents of the conversations).

The purpose of the statutory requirements of § 2518 is not to preclude the government's resort to wiretapping " 'until after all other possible means of investigation have been exhausted by investigative agents; rather, [the statute] only require[s] that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.' " *Torres,* 901 F.2d at 231 (quoting *United States v. Vazquez,* 605 F.2d 1269, 1282 (2d Cir.1979) (quoting, in turn, *United States v. Hinton,* 543 F.2d 1002, 1011 (2d Cir.1976))). The issue of whether a normal investigative method has been exhausted must be tested in a practical and common sense manner. *See id.* at 232.

Here, contrary to Roman's claim, neither the Lompoc prison tape recordings nor informant information were adequate means of investigation. With respect to the Lompoc tapes, the Affidavit stated that although the tapes were helpful in identifying criminal participants and in determining the organizational structure of the Latin Kings, the overall value of the tapes was limited without the ability to monitor calls that follow the carefully coded directives of Millet on the prison tapes. Moreover, the government explained that information sought through its requested wire interceptions, such as the sources of drug supply and the location of drug proceeds, could not adequately be obtained through its informants, who were street dealers or individuals not operating at the core of the racketeering and drug conspiracies.

Further, the Affidavit detailed the exhaustion of other investigative techniques, including the limitations or ineffectiveness of physical surveillance, grand jury subpoenas, confidential informants and cooperating sources, undercover police officers and agents, interviews of subjects or associates, search warrants and pen registers. In particular, the Affidavit noted that alternative techniques were unavailing in light of the Latin King's coordination of drug trafficking and organized sanctioning of assaults and killings, together with the secretive manner in which the illegal activities were carried out. We conclude that the district court properly found that conventional investigative techniques had been exhausted and that alternatives to wire interception would be unlikely to succeed or would be too dangerous. Thus, the motion to suppress was properly denied.

### D. Roman's Motion for Recusal

Roman claims that Judge Nevas should have recused himself under 28 U.S.C. § 455(a), (b)(1). Prior to trial, Roman moved for recusal, arguing that the district court pre-determined that all of the defendants and unindicted cooperating witnesses were part of one large conspiracy. Roman did not base his motion on any bias shown by the judge. Rather, his assertion of prejudice is based on two grounds: (1) the court's ruling on co-defendant Vidro's pre-trial motion to suppress evidence, in which the court stated that "Vidro is an alleged leader of the Latin Kings, a violent criminal organization that is active in the Connecticut prison system"; and (2) that in reviewing and authorizing wire intercepts in the case, the court heard and credited inadmissible hearsay evidence of a conspiracy. Roman asserts that Judge Nevas would not have been able to make open-minded and impartial determinations at trial regarding whether the government proved the existence of a conspiracy, which is a prerequisite to ruling on the admissibility of co-conspirator statements. Judge Nevas denied the motion to recuse himself, finding that judicial rulings are generally an insufficient predicate under § 455 for recusal, and that he did not have "personal knowledge" of the facts concerning this case as required under § 455(b)(1). On appeal, Roman argues that his conviction should be reversed because Judge Nevas erred in denying his motion for recusal. We disagree.

 Under § 455(a), a federal judge must recuse "himself in any proceeding in which his impartiality might reasonably be questioned." "In deciding whether or not to affirm a judge's denial of a recusal motion, a court of appeals must ask the following question: ... would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?" *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992) (citing *DeLuca v. Long Island Lighting Co., Inc.,* 862 F.2d 427, 428–29 (2d Cir.1988)). A federal judge shall also recuse himself "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." § 455(b)(1).

 We review a district judge's denial of a recusal motion only for abuse of discretion. *See United States v. Morrison,* 153 F.3d 34, 48 (2d Cir.1998). No abuse of discretion occurred here. In *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the Supreme Court held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555, 114 S.Ct. 1147. The Court further stated that opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.; In re Int'l Bus. Mach. Corp.,* 45 F.3d 641, 644 (2d Cir.1995).

Roman's motion for recusal relied on the judicial rulings on wiretap applications and a co-defendant's motion to suppress that were issued by the district court in the exercise of its judicial duties. Since the court's rulings were events that "occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossi-

ble," *Liteky,* 510 U.S. at 556, 114 S.Ct. 1147; *see United States v. Conte,* 99 F.3d 60, 65 (2d Cir.1996), Roman's motion failed to show that there was an objectively reasonable basis for questioning the judge's impartiality under § 455(a), *see United States v. Colon,* 961 F.2d 41, 44 (2d Cir. 1992) (stating that "earlier adverse rulings, without more, do not provide a reasonable basis for questioning a judge's impartiality."). Moreover, Judge Nevas noted that since he did not have any "personal knowledge" of the disputed evidentiary facts of the case, his recusal was not warranted under § 455(b)(1). Under these circumstances, Judge Nevas did not abuse his discretion in declining to recuse himself.

### E. Ineffective Assistance of Counsel

Burgos and G. Rivera claim that their respective trial counsels' performance was so deficient and prejudicial that it constituted ineffective assistance of counsel. Specifically, G. Rivera argues that his conviction should be reversed and his case remanded for a new trial because his counsel was ineffective by failing to (1) offer evidence of his brain damage and present a defense of mental incapacity; and (2) object to the admission of certain co-conspirator statements as hearsay. Burgos asserts, for the first time on direct appeal, that his counsel was also ineffective because he failed to conduct a proper pretrial investigation and, therefore, that his case should be remanded for an evidentiary hearing to explore the issue. These contentions are without merit.

#### 1. G. Rivera

 A defendant challenging his conviction and sentence on the basis of ineffective assistance of counsel bears a heavy burden. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court adopted a strong presumption that trial counsel provides effective assistance. To overcome this presumption, a defendant must show both (1) "deficient perfor-

mance," that is, that his trial counsel's performance "fell below an objective standard of reasonableness" under "prevailing professional norms," *id.* at 688, 104 S.Ct. 2052; and (2) "prejudice," that is, that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. Here, G. Rivera has met neither prong of the *Strickland* test.

■ First, G. Rivera argues that because his trial counsel knew of facts which would have supported a diminished capacity defense, he was ineffective for not presenting that defense at trial. In particular, G. Rivera's appellate counsel cites several mental health reports from 1992 through 1993, concluding that G. Rivera was incompetent to stand trial and that he had brain damage from several serious head injuries. Because of this alleged brain damage, appellate counsel also asserts that G. Rivera did not have the ability to participate in the drug conspiracy or did not have the specific intent to distribute drugs. In addition, appellate counsel points out that a doctor who examined G. Rivera and determined that he was incompetent in a 1993 report, again determined in a 1996 report that G. Rivera remained totally incompetent.

Irrespective of such evidence, trial counsel was aware of at least five other diagnoses, reached on five different occasions from 1992 through 1995, that G. Rivera was either: (1) malingering his mental problems; (2) was not suffering from significant organic brain damage or severe mental disease or defect during the time of his drug conspiracy offense; or (3) was competent to stand trial. Since there was ample evidence that G. Rivera was possibly faking his mental illness, we find that trial counsel's decision not to present any of the mental reports or testimony of the doctor was a sound trial strategy that "falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see also Unit-*

*ed States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.) (finding that "the tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation."), *cert. denied,* —— U.S. ——, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997); *Kieser v. New York,* 56 F.3d 16, 18 (2d Cir.1995) (per curiam) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks omitted).

■ Furthermore, we find that trial counsel's failure to object to the testimony of co-conspirators as alleged hearsay does not amount to deficient performance. As noted above, there were sound evidentiary bases for the admission of the challenged co-conspirator statements and, therefore, trial counsel was not ineffective for failing to object. *See United States v. Brooks,* 82 F.3d 50, 53–54 (2d Cir.1996) (finding that trial counsel acted properly in not objecting to testimony that was admissible against his client as an admission by a co-conspirator); *United States v. Boothe,* 994 F.2d 63, 68–69 (2d Cir.1993) (holding that trial counsel did not render ineffective assistance of counsel by failing to object to co-conspirator statements as hearsay when such statements were admissible as non-hearsay under Fed.R.Evid. 801(d)(2)(E)).

■ Finally, trial counsel's performance did not result in prejudice to G. Rivera. Here, there is no reason to believe that had trial counsel presented a diminished mental capacity defense, or objected and succeeded in excluding co-conspirator statements, that the outcome of the trial would have been different. The wiretap evidence where G. Rivera is heard speaking clearly to his co-conspirators about drug transactions provided strong proof that G. Rivera participated in the drug conspiracy. Thus, regardless of the possible impact of reports or testimony about his mental condition, the wiretap evidence provides a "reasonable probabili-

ty" that the jury would have concluded, as did several professionals and the district court, that G. Rivera had malingered his mental illness to avoid being held responsible for his drug trafficking activities. Moreover, there was other evidence, aside from the co-conspirator statements, sufficient to convict G. Rivera. Therefore, we conclude that G. Rivera did not suffer prejudice. Hence, G. Rivera fails under both prongs of *Strickland* to overcome the strong presumption that his trial counsel provided effective assistance.

### 2. Burgos

Burgos claims, for the first time on appeal, that his trial counsel was ineffective, asserting that if his counsel had conducted a proper pre-trial investigation, Burgos would have made a different decision regarding his guilty plea. Citing *Billy–Eko v. United States*, 8 F.3d 111 (2d Cir.1993), Burgos submits that his claim is based on facts outside the record and requests that the issue be remanded to the district court for an evidentiary hearing.

 In *Billy–Eko*, we stated that appellate counsel are encouraged to err on the side of including an ineffective assistance claim on direct appeal, even if there is a need for further extrinsic evidence, to preclude the possibility of procedural forfeiture. *See id.* at 116. We further stated in *Billy–Eko* that inclusion of such an ineffective assistance claim gives us "the opportunity to either remand the claim to the district court or leave the defendant to his post-conviction remedies by declining to rule on the claim." *Id.* Nevertheless, we have clarified that "the *Billy–Eko* doctrine is discretionary," *Salameh*, 152 F.3d at 160–61, and that remand is not " 'a mandatory requirement, and [as] such claims are ordinarily pursued by a subsequent § 2255 petition.' " *United States v. Workman*, 80 F.3d 688, 701 (2d Cir.1996) (quoting *Riascos–Prado v. United States*, 66 F.3d 30, 35 (2d Cir.1995)). Given our disinclination to grant direct review of such a claim, and since there is an insufficient factual record

and Burgos failed to explain why we should hear his ineffective assistance claim at this point, we decline to address his claim further and conclude that it would be more properly raised in a § 2255 petition.

### F. Burgos' Alleged Involuntary Guilty Plea

 Burgos argues, for the first time on appeal, that he should be allowed to withdraw his guilty plea because it was made involuntarily. Specifically, Burgos claims that his plea of guilty was the result of a threat made by one of the jurors who had decided his guilt before hearing the evidence. Burgos asserts that during trial he became aware that a juror's son was incarcerated, but that the juror lied about it during *voir dire* because he wanted to ensure that all the Latin Kings went to jail like his son had. Burgos further claims that he told his counsel about it, but that counsel failed to act on this information. Burgos concedes this issue of an involuntary guilty plea presents facts which are outside of the record and, therefore, requests that the issue be remanded to the district court for an evidentiary hearing where it may be more fully developed.

We decline to remand this issue for there is nothing in the record to substantiate Burgos' claim. In fact, Burgos' sworn statements during his plea hearing directly contradict an involuntary guilty plea for he stated under oath, *inter alia*, that (1) he was satisfied with his counsel's representation of him; (2) the plea was of his own free will; (3) he was guilty and stated that he understood that the court would not accept his plea if he claimed to be innocent; and (4) he had no questions regarding the sentencing proceeding after the plea was entered. We find that these statements undermine Burgos' claim that his guilty plea was involuntary. *See Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (holding that sworn statements made during allocution are presumptively valid); *United*

*States v. Maher,* 108 F.3d 1513, 1530 (2d Cir.1997) (same).

### G. Denial of Defense Witness Immunity

██ Vidro requested that the government grant immunity to defense witness Edwin Ortiz, a Latin King member incarcerated for his role in the Council murder, as described above. When the government refused, Vidro requested that the district court order the government to grant such immunity, but it denied her request. Vidro argues that this denial resulted in an unfair trial and deprivation of her due process rights. This claim lacks merit.

 Absent extraordinary circumstances, "the Due Process Clause imposes no requirement that defense witness immunity be ordered 'whenever it seems fair to grant it.'" *Blissett v. Lefevre,* 924 F.2d 434, 441 (2d Cir.1991) (quoting *United States v. Turkish,* 623 F.2d 769, 777 (2d Cir.1980)). We apply a three-part test for determining whether there are exceptional circumstances warranting a directive that the government grant immunity to a defense witness. *See United States v. Ballistrea,* 101 F.3d 827, 837 (2d Cir.1996); *United States v. Bahadar,* 954 F.2d 821, 826 (2d Cir.1992). First, the district court must find that the government, through its own overreaching, has forced the witness to invoke the Fifth Amendment or, that the government has engaged in discriminatory use of grants of immunity to gain a tactical advantage; second, the witness' testimony must be material, exculpatory and not cumulative; and third, the defendant has no other source to obtain the evidence. *See Bahadar,* 954 F.2d at 826. The defendant bears the burden of showing that each of these elements is present. *See United States v. Pinto,* 850 F.2d 927, 935 (2d Cir.1988).

██ With respect to the first prong, Vidro points to the government's granting of immunity to Torres, a Latin King member who, like Ortiz, was involved in the Council murder. Vidro claims that this granting of immunity to Torres, but not to Ortiz, gave the government a tactical advantage. We have rejected the argument that "immunity must be granted to defense witnesses in order to redress a supposed government 'advantage' over the defense." *Blissett,* 924 F.2d at 442 (citing *Turkish,* 623 F.2d at 774). "Only when a prosecutor has abused the government's ability to grant immunity by using it in a discriminatory fashion for the purpose of gaining a tactical advantage does due process require a grant of immunity for a defense witness." *Id.* Nothing in the record indicates such a discriminatory use of immunity. In fact, when Vidro requested the district court to order immunity, she stated that she was not claiming that there was any prosecutorial misconduct. Since Vidro has not satisfied the first prong of the test requiring prosecutorial misconduct or overreaching, we need not address the issues of the materiality of Ortiz' testimony and Vidro's access to such evidence. We conclude that the court properly declined to order the government to grant immunity to Ortiz.

### H. Zapata's Double Jeopardy Claim

The jury found that Zapata committed the following six predicate acts of racketeering under both the RICO and RICO conspiracy counts:(1) conspiracy to deal drugs; (2) conspiracy to murder Reyes; (3) murder of Council; (4) conspiracy to murder and murder of Valedon; (5) murder of Calo; and (6) murder of Villafane. On appeal, Zapata assumes that the racketeering acts of murder alleged against him under the RICO counts will be dismissed based on his sufficiency of the evidence claims, and thereby, the remaining racketeering acts only consist of conspiracies. Under this assumption, Zapata asserts that, because the district court allegedly charged the jury that proof of the elements of these conspiracies under the RICO count did not require proving elements different than those needed to con-

vict under the RICO conspiracy count, he was charged with the same offense twice. Zapata therefore argues that the Fifth Amendment's Double Jeopardy Clause, which protects against both multiple prosecutions and multiple punishments for the same offense, was violated. We disagree.

First, in *United States v. Sessa,* 125 F.3d 68, 71–73 (2d Cir.1997), *cert. denied sub nom. Scarpa v. United States,* — U.S. ——, 118 S.Ct. 731, 139 L.Ed.2d 669 (1998), we rejected an argument similar to the one Zapata raises and concluded that there is no double jeopardy violation where a defendant is charged and convicted of a substantive RICO offense based upon predicate acts which are themselves conspiracies and is subsequently charged with RICO conspiracy. Second, as noted above, we find no basis for reversing the jury's conclusions with respect to Zapata's predicate acts of murder. Accordingly, we find no double jeopardy violation here.

## I. Millet's Detainer Act Claim

At the time Millet's federal charges arose, he was serving a state criminal sentence and had been imprisoned as a contract boarder at a federal prison in Lompoc, California. On January 13, 1995, the United States took custody of Millet in Connecticut and he was arraigned on January 17, 1995. On June 15, 1995, Millet moved to dismiss his case on the grounds that he had not been brought to trial within the 120–day time limit established under Article IV(c) of the Interstate Agreement on Detainers ("Detainers Act").[15] The district court denied Millet's motion.

Absent tolling, the 120–day clock under the Detainers Act entitled Millet to be brought to trial on or before May 17, 1995. Although Millet did not file any pre-trial motions, his co-defendants had such

motions pending throughout the period of January 17 to the time the trial commenced on July 5, 1995. Millet argues that the time taken to address his co-defendants' pre-trial motions, the primary reason for delay after May 17, should not have been used to toll the time in which Millet was brought to trial under the Detainers Act. This argument lacks merit.

A delay caused by the filing of pre-trial motions by co-defendants is "excludable time" under the Detainers Act and, therefore, tolls the 120–day clock. *See United States v. Cephas,* 937 F.2d 816, 821 (2d Cir.1991); *see also United States v. Collins,* 90 F.3d 1420, 1427 (9th Cir.1996); *United States v. Odom,* 674 F.2d 228, 231–32 (4th Cir.1982). In Millet's case, the 120–day Detainers Act clock started on January 17. All of the delay after May 17 and until the day before Millet's trial actually commenced was excludable time because of the pre-trial motions filed by his co-defendants. Therefore, there was no Detainers Act violation under Article IV(c).

## VI. Sentencing

Several defendants-appellants contend that the district court erred in calculating their respective sentences under the United States Sentencing Guidelines. Their contentions lack merit.

### A. Burgos' Claims

Burgos appeals the sentence he received under the Guidelines following his plea of guilty to assault in aid of racketeering and use of a telephone to facilitate a drug transaction. As part of his plea agreement with the government, Burgos stipulated to additional related offenses that included, *inter alia,* participating in the conduct of the Latin Kings through a pattern of rack-

---

**15.** Article IV(c) provides, in pertinent part, that:

In respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving

State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

18 U.S.C. app., § 2. Art. IV(c) (1994).

eteering activity, conspiring to distribute narcotics and conspiring to murder Reyes.

As to the drug conspiracy offense, Burgos' Presentence Report ("PSR") noted the following facts. Burgos operated a Latin King drug block on Yale Street in Bridgeport from the fall of 1991 to the summer of 1993. From late 1991 to November 1992, Burgos employed Morales as his lieutenant for his Yale Street drug operations, Cyr as his primary drug bagger and numerous other Latin Kings as street sellers. Even after Burgos was incarcerated in November 1992 on unrelated state charges, the evidence indicated that Morales, Cyr and numerous street sellers continued to sell crack cocaine (that is, cocaine base) at Yale Street and provided money to Burgos and his family. Under Burgos' direction, at least 1.5 kilograms of crack cocaine were sold every week at Yale Street. Additionally, from the summer of 1992 to November 1992, Burgos supplied a kilogram of powder cocaine per week to Vidro and Zapata which they sold at a Latin King drug block in New Haven. Burgos also stipulated in his plea agreement that from November 1991 to October 1992 he was responsible for the distribution of between 50 to 150 kilograms of cocaine or cocaine base. Using conservative figures, the PSR determined that from November 1991 to October 1992 Burgos was responsible for the distribution of 50 kilograms of crack cocaine at Yale Street and that he was responsible for over 20 kilograms of powder cocaine during his association with Vidro and Zapata.

The PSR calculated a base offense level of 38 pursuant to U.S.S.G. § 2D1.1(a)(3), (c) because more than 1.5 kilograms of cocaine base were involved, added two levels for possession of a dangerous weapon, *id.* at § 2D1.1(b)(1), added four levels because Burgos was an "organizer or leader" of the Yale Street drug block which involved five or more participants, *id.* at § 3B1.1(a), and subtracted two levels for acceptance of responsibility, *id.* at § 3E1.1(a), resulting in a total offense lev-

el of 42. Burgos' criminal history category was II, thus yielding a Guidelines imprisonment range of 360 months to life. Because the combined statutory maximum sentence for both offenses to which Burgos pled guilty was 288 months, the Guidelines range of 360 months to life reverted to a "range" of 288 months. Accordingly, the district court sentenced Burgos to a 288–month term of imprisonment, to be followed by a 3–year term of supervised release.

### 1. Offense–Role Enhancement under U.S.S.G. § 3B1.1(a)

 Burgos contends that the district court erred by increasing his offense level by four levels for his role as an "organizer or leader" pursuant to U.S.S.G. § 3B1.1(a). In particular, he contends that the record does not support the court's offense-role enhancement because there was no showing that five individuals or more were involved in the drug offense, that he exercised direct control over another criminally culpable participant, or that his drug block's activities were extensive. He also asserts that the court failed to make specific factual findings at the sentencing hearing to allow for adequate appellate review in determining whether the enhancement was proper. He therefore argues that his sentence should be remanded for further factual findings. We disagree.

 First, Burgos waived his right to contest the enhancement by failing to raise the issue before the district court. " 'Generally, issues not raised in the trial court, including sentencing issues, will be deemed waived on appeal in the absence of plain errors or defects affecting substantial rights.' " *United States v. Margiotti*, 85 F.3d 100, 104 (2d Cir.1996) (per curiam) (quoting *United States v. Liebman*, 40 F.3d 544, 551 (2d Cir.1994)). In order to preserve an issue for appeal, a defendant must either "object to the presentence report or ... raise the objection at the time of sentencing." *United States v. Rodriguez*, 943 F.2d 215, 216 (2d Cir.1991). In

his PSR objection letter, Burgos did not challenge the PSR's determination that he was an organizer or leader requiring a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a). Further, he failed to object to the enhancement at sentencing. Thus, Burgos waived this claim.

Nevertheless, we will consider an argument not raised below if there is plain error, that is, if "the alleged errors or defects ... affect a defendant's substantial rights the violation of which would result in manifest injustice." *United States v. Keppler*, 2 F.3d 21, 24 (2d Cir.1993) (internal quotation marks and citation omitted). Here, there is no plain error. First, Burgos conceded at sentencing that none of his objections regarding the offense-role enhancement would effect his Guidelines range. Second, even if his offense level was not enhanced by four-levels, Burgos' 288–month sentence would still fall within the resulting Guidelines range of 262 to 327 months. Further, the court found that under the facts there was no justification for downward departure from 288 months and, therefore, Burgos would still have received the same sentence. *See United States v. Bermingham*, 855 F.2d 925, 931 (2d Cir.1988) ("[D]isputes about applicable guidelines need not be resolved where the sentence falls within either of two arguably applicable guideline ranges and the same sentence would have been imposed under either guideline range."). Accordingly, we have noted that "when a defendant could have received exactly the same sentence in the absence of the alleged error, we cannot say that its occurrence affected defendant's substantial rights resulting in a manifest injustice." *Keppler*, 2 F.3d at 24 (internal quotation marks omitted) (quoting *United States v. Arigbodi*, 924 F.2d 462, 464 (2d Cir.1991) (per curiam)).

Finally, we reject Burgos' claim that the district court failed to make specific factual findings to support the offense-role enhancement. At sentencing, the court determined the amount of drugs attributable to Burgos and the applicable offense level

for his offenses. However, the court neglected to make an explicit finding that (1) he was an "organizer or leader," and (2) his drug trafficking activities either "involved five or more participants or [were] otherwise extensive" as required for an enhancement under U.S.S.G. § 3B1.1(a). Instead, the court accepted the PSR's findings and Guideline calculations that emphasized Burgos' leadership role with the Yale Street drug block.

■■■■ Certainly, a sentencing court, rather than simply adopting a PSR, must make "specific factual findings" to sustain an enhancement under § 3B1.1. *See United States v. Greenfield*, 44 F.3d 1141, 1147 n. 4 (2d Cir.1995) ("stress[ing] that a sentencing court must make specific factual findings in support of any offense-role enhancement."). However, in order to preserve a sentencing claim for appeal, the defendant must either voice an objection at sentencing or object to the presentence report. *See United States v. Gomez*, 103 F.3d 249, 254 (2d Cir.1997); *see also Rodriguez*, 943 F.2d at 216–17 (noting that failure to object to sentencing enhancement presented in presentence report generally constitutes waiver of sentencing claim). Since Burgos failed to object to the PSR's four-level enhancement, and since we find that there is no plain error because the record clearly demonstrates that he had a leadership role and employed well over five participants on the Yale Street drug block, we decline to remand his enhancement issue for further findings.

### 2. Determination of Controlled Substance

■■■■ At sentencing, the district court concluded that Burgos was responsible for distributing "at least 50 kilograms of cocaine and/or cocaine base." Burgos argues that the court erred in calculating his drug quantity on the basis of crack cocaine because there was insufficient proof that the "form" of cocaine base attributed to him was in fact "crack," that is, he claims

not all forms of cocaine base are crack. In particular, Burgos asserts that the government offered no scientific evidence that the substance was manufactured with sodium bicarbonate that he alleges is needed to make crack cocaine. For these reasons, he claims that his sentence should be remanded and determined solely on the basis of "powder" cocaine which carries a lower offense level under the Guidelines. Since this issue was not presented below, we review for plain error.

Section 2D1.1 is the operative section of the Guidelines for drug offenses involving "cocaine base" and "cocaine." This section provides that " '[c]rack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1(c), Note (D). In drafting this definition, the Sentencing Commission explained that "forms of cocaine base other than crack ... will be treated as cocaine." U.S.S.G. app. C, amend. 487 (effective Nov. 1, 1993).

▇▇▇▇ We conclude that the district court correctly sentenced Burgos based on a finding that the cocaine attributed to him was "crack." First, in his PSR objection letter, Burgos failed to challenge the PSR's determination that he was responsible for distributing cocaine base at Yale Street. Rather, he objected to the PSR's drug quantity calculation in the event that Congress decides to equalize the penalties between amounts of cocaine and cocaine base. Second, Burgos did not object at sentencing to the court's reference to drugs distributed at the Yale Street drug block as crack. Third, the evidence presented at trial clearly established that the drug block distributed crack. For instance, Burgos' primary drug bagger Cyr testified that the Yale Street operation sold crack and he typically manufactured it with Morales. Finally, we conclude that in proving a substance is crack, the government is not required to show that the cocaine was processed with sodium bicar-

bonate. *See* U.S.S.G. § 2D1.1(c), Note D; *see also United States v. Abdul*, 122 F.3d 477, 479 (7th Cir.1997) ("[W]hile crack might generally be produced using sodium bicarbonate, production with sodium bicarbonate is not the exclusive preparation method recognized for purposes of § 2D1.1(c).").

### 3. Relevant Conduct with Respect to Drug Quantity

Burgos further argues (1) that the district court erred in determining his relevant conduct for sentencing purposes by using drug quantities distributed by Latin King members at Yale Street after he was incarcerated in November 1992; (2) that the court failed to consider whether such distribution efforts were reasonably foreseeable to him and within the scope of his agreement with the conspiracy, given the fact that Burgos' personal participation ceased after his incarceration; and (3) that the probation office failed to consider whether payments to Burgos and his family received after he was incarcerated were charitable contributions rather than his share of the drug proceeds. These arguments are without merit.

▇▇▇▇ As a preliminary matter, the issue of whether Burgos' relevant conduct should include drug quantities distributed after his incarceration in November 1992 is moot because the quantity of crack cocaine attributable to him before his incarceration was clearly greater than 1.5 kilograms as required by the Guidelines. Further, in his PSR objection letter, Burgos did not challenge the time period of the drug quantity calculation, that is, from the fall of 1991 until the summer of 1993. In addition, the record clearly supported that Burgos continued to run the Yale Street drug block until the summer of 1993. In fact, Burgos' counsel conceded at sentencing that Cyr continued to work for Burgos in 1993. As to the court's alleged "lack of reasonable foreseeability" analysis, the court indicated during sentencing, based on the testimony of Cyr, that Burgos con-

tinued to run the drug block after his incarceration. Therefore, Burgos' direct involvement did not require such analysis. *See United States v. Chalarca*, 95 F.3d 239, 243 (2d Cir.1996) (noting that "the quantity of drugs attributed to a defendant need not be foreseeable to him when he personally participates, in a direct way, in a jointly undertaken drug transaction."). Burgos' direct participation also supports that the PSR's conclusion that the payments he received after his incarceration were in fact drug proceeds rather than charitable contributions to his family.

### B. Calderon's Claims

Calderon appeals from his sentence following his guilty plea to participating in the Latin Kings' drug conspiracy and receiving a firearm while under indictment for a felony offense. With respect to his drug offense, the PSR determined that Calderon was responsible for distributing 80 grams of crack cocaine at the East Main Street drug block in Bridgeport, which was run by Roman. The PSR also found that Calderon's base offense level was 32 pursuant to U.S.S.G. § 2D1.1(c)(4), the level applicable to offenses involving between 50 and 150 grams of crack cocaine. The PSR accorded Calderon a three-level increase pursuant to U.S.S.G. § 3B1.1(b) because it determined that he was Roman's drug dealing lieutenant, that he had supervisory control over numerous street level dealers, supplied the block with drugs and collected drug proceeds. The PSR neglected to indicate the number of persons under Calderon's supervisory control.

Calderon argues that the district court erred in applying a base offense level of 32 to his drug conspiracy offense because it was allegedly based on an incorrect amount of crack cocaine attributed to him. He claims that although he received 80 grams of crack cocaine from a co-conspirator, he did not actually sell the entire amount and, therefore, he was responsible for less than 50 grams of crack cocaine,

requiring a lower offense level. Calderon also contends that his enhancement for his supervisory role in the drug conspiracy was improper because he only held the position of secretary for the Bridgeport chapter of the Latin Kings, and thus, he did not supervise any persons. These arguments are without merit.

■■■■ Since Calderon failed to object to the PSR's determinations or formally object to them at sentencing, he waived his claims. We therefore review for plain error and find none here. First, we find that the district court correctly attributed 80 grams of crack cocaine to Calderon. Under U.S.S.G. § 1B1.3(a)(1)(A), we have noted that "a defendant who is a party to [a drug] conspiracy is accountable for the quantities of narcotics in which he had a direct, personal involvement." *Chalarca*, 95 F.3d at 243. Here, it is undisputed that Calderon had such an involvement. Moreover, although Calderon asserts that he did not actually sell the entire 80 grams of crack cocaine that he possessed, we find that he failed to offer any evidence to demonstrate this fact or to show that he should not be held responsible for the entire amount. In fact, Calderon agreed in his plea agreement that the drug conspiracy offense involved more that 50 grams of crack cocaine, an amount sufficient to apply a base offense level of 32. Second, although the PSR did not state the number of persons under his supervisory control, the evidence clearly supports that Calderon, as a lieutenant for Roman's drug operations, supervised at least five persons as needed under U.S.S.G. § 3B1.1(b) to warrant a three-level enhancement.

### C. Millet's Claims

Millet contends that the district court erred in sentencing him to life on the drug conspiracy count based on a finding that, as leader of the Latin Kings, he was responsible for all the drugs distributed by the gang and this amount was at least 1.5 kilograms of crack cocaine. Millet concedes that he entered into a conspiracy

with Latin Kings J. Rodriguez and Vasquez to distribute drugs in Fair Haven, Connecticut, in September 1993, and that, as Vasquez testified at trial, there were 62 grams of crack cocaine involved in that conspiracy. However, Millet claims that there was insufficient evidence to establish that he was the leader of the Latin Kings' widespread drug conspiracy. Further, adopting Burgos' argument above (*see* VI. A.2), he argues that the court should have sentenced him based only on 62 grams of powder, rather than crack, cocaine because the identity of the substance was inadequately proven. These arguments are entirely without merit.

Since Millet did not raise the issue of the drug substance's identity below, we review for plain error and find none here. First, Millet and the district court made repeated references to crack cocaine during the sentencing proceedings. Second, his co-conspirators testified that crack cocaine was sold at the Fair Haven drug block. Indeed, this testimony is sufficient to prove by a preponderance of the evidence that the substance involved in the Latin Kings' drug conspiracy was crack, rather than powder, cocaine. *See Miller*, 116 F.3d at 684 (noting that "[f]acts, for purposes of sentencing, need be established only by a preponderance of the evidence").

As to the court's finding Millet accountable for at least 1.5 kilograms of crack cocaine, we have noted that "where a defendant was a member of a narcotics distribution conspiracy, all transactions entered into by him or by his coconspirators, if they were either known to him or reasonably foreseeable by him, may be attributed to him for purposes of calculating his sentence under the Guidelines." *Id.* Here, there is significant evidence of Millet's knowing involvement in the drug activities of the Connecticut Latin Kings, which involved amounts of crack cocaine far in excess of 1.5 kilograms. Contrary to Millet's claim, wiretapped conversations showed that he did act as the leader of the

Latin Kings and that he was aware of almost every aspect of the gang's widespread drug conspiracy. For example, in these wiretapped conversations Millet: (1) discussed with Roman the need to establish a drug tax on Latin King dealers so drug proceeds could be used to pay for gang communications, meeting places, bond for incarcerated members and gun purchases; (2) participated and advised Roman on resolving conflicts between Latin King drug dealers; (3) encouraged Morales to establish a security squad to maintain harmony among the gang's drug dealers; (4) advocated that Latin King members and officers open new drug blocks; and (5) encouraged J. Rodriguez to discipline a suspected informant who threatened the gang's illegal activities. Considering Millet's involvement in almost all aspects of the drug conspiracy, the evidence demonstrates that Millet knew or reasonably should have known that his Latin Kings organization distributed at least 1.5 kilograms of crack cocaine. Accordingly, we conclude that the district court's life sentence on Millet's drug conspiracy offense based on 1.5 kilograms of crack cocaine was proper.

**D. Authority to Depart Downward**

Morales was sentenced to three life terms and Zapata was sentenced to four life terms for their respective VICAR murders, in violation of 18 U.S.C. § 1959(a). They argue that these life terms should be remanded for resentencing because Judge Nevas failed to recognize that he had discretionary authority under the Guidelines to depart downward. Their claims are without merit.

Although a sentencing court's discretionary refusal to depart downward is generally not appealable, an exception exists when the court mistakenly concluded as a matter of law that it lacked legal authority to depart. *See United States v. Martin*, 78 F.3d 808, 814 (2d Cir.1996). In determining whether a dis-

trict judge merely declined to exercise his discretion to depart or refused to depart because of a mistaken belief that he lacked the ability to do so, "[w]e apply a presumption that district judges understand the much-discussed processes by which they may, in circumstances permitted by law, exercise discretion to depart from the sentence range prescribed by the Guidelines calculus." *United States v. Brown*, 98 F.3d 690, 694 (2d Cir.1996) (per curiam) (citing *United States v. Sweeney*, 90 F.3d 55, 58 (2d Cir.1996)). This Court "do[es] not require that district judges by robotic incantations state 'for the record' or otherwise that they are aware of this or that arguable authority to depart but that they have consciously elected not to exercise it." *Id.*

■■■ In Morales' case, although Judge Nevas stated that he had "no discretion" and that he "must impose a sentence of life," the record clearly establishes that the district judge knew he had the authority to depart and was imposing a life sentence because Morales did not present sufficient grounds to justify a downward departure. *See id.* at 693 ("When a sentencing judge asserts that he has no authority to depart ... we do not infer that he is saying that the Guidelines never permit departure ... but *that the facts of the case at hand do not provide any basis for lawful departure.*"). During the sentencing hearing, after addressing Morales' objections to the PSR and finding that the applicable Guidelines range was life, Judge Nevas asked for a downward departure argument. Judge Nevas determined that Morales was "arguing for a downward departure based on certain circumstances" and that "the only way that this court could come off the life sentence" was "[if] there were compelling circumstances and reasons why there should be a downward departure." In that regard, Judge Nevas found that there were no "unique" circumstances present that would justify a downward departure. Likewise, after hearing Zapata's downward departure argument, Judge Nevas

stated that he was declining to depart because "[t]here's absolutely no basis to do so." Accordingly, we conclude that Judge Nevas understood his authority to depart and therefore refuse to remand Morales' and Zapata's VICAR convictions for resentencing.

### E. Roman's Claims

Roman was convicted of conspiring to murder and murdering Robinson under a predicate act of racketeering of the RICO count, in violation of 18 U.S.C. § 1962(c), and under two VICAR counts, in violation of 18 U.S.C. § 1959(a). The substantive murder counts charged that Roman "intentionally" and "knowingly" murdered Robinson in violation of Conn. Gen.Stat. § 53a–54a. The Connecticut statute, the state's only degree of non-capital murder, provides in pertinent part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person." Conn. Gen.Stat. § 53a–54a.

■■■ In order to calculate Roman's offense level for the murder of Robinson, felonious conduct that violated Connecticut law, Judge Nevas had to determine "the most analogous federal offense," U.S.S.G. §§ 2E1.1 (RICO), Commentary, Application Note 2, 2E1.3 (VICAR), Commentary, Application Note 1, and select the "most applicable" sentencing guideline, U.S.S.G. § 1B1.2(a). Here, the district court found that federal first degree murder was the most analogous federal offense to state murder under Conn. Gen.Stat. § 53a–54a. Therefore, the district court applied the first degree murder guideline, U.S.S.G. § 2A1.1, to Roman's RICO and VICAR convictions for the Robinson murder.

Roman argues that because U.S.S.G. § 2A1.1 requires malice aforethought or premeditation, elements the government would not be required to prove under the state law offense to obtain a conviction, it was error for the district court to apply the first degree murder guideline to the Robinson murder convictions. Instead, he

contends that the court should have applied the second degree murder guideline, U.S.S.G. § 2A1.2, which carries a lower offense level than the first degree guideline. We disagree.

In reviewing a sentence, we are required to accept a district court's factual findings "unless they are clearly erroneous and shall give due deference to [the] court's application of the guidelines to the facts [of the case]," 18 U.S.C. § 3742(e) (1994), "rather than review them *de novo*," *Miller*, 116 F.3d at 677 (internal quotation marks omitted) (quoting *United States v. Cefalu*, 85 F.3d 964, 968 n. 6 (2d Cir.1996)). Here, we find there is no error, much less clear error, in the district court's conclusion that federal first degree murder was the most analogous federal offense, and thus, that U.S.S.G. § 2A1.1 provided the appropriate offense level. Indeed, we have reached a similar conclusion in *United States v. Minicone*, 960 F.2d 1099 (2d Cir.1992).

In *Minicone*, involving New York law, the defendant argued, as Roman does here, that it was error to conclude that the most analogous federal offense was federal first degree murder because state law would have categorized the murder at issue only as second degree murder. This Court rejected that claim by comparing the language of New York's second degree murder statute, which is nearly identical to the Connecticut statute at issue here,[16] with 18 U.S.C. § 1111 (1988), which defines murder in the first degree as "willful, deliberate, malicious, and premeditated killing." The Court held that the district court did not err in finding that the most analogous federal offense was first degree murder under § 1111. *Minicone*, 960 F.2d at 1110. Thus, contrary to Roman's claim, the absence of reference to premeditation or malice aforethought in § 53a–54a does not mean that federal first degree murder is not the most analogous federal offense. Clearly, § 1111's definition of

federal first degree murder is similar to that of § 53a–54a and, therefore, we find no basis to disturb the district court's application of U.S.S.G. § 2A1.1.

### F. Vidro's Claims

#### 1. Offense–Role Enhancement under U.S.S.G. § 3B1.1(a)

Vidro argues that she should not have received a four-level enhancement under U.S.S.G. § 3B1.1(a) for her leadership role in the Council murder because there was no evidence that she controlled the Latin Kings who were involved in the murder. Since Vidro failed to preserve this issue for appeal because she did not raise it below, we review for plain error. Here, we find no error because the evidence clearly showed that Vidro was an "organizer or leader" in connection with this murder and that the criminal activity involved at least five participants under her supervisory control. *See* U.S.S.G. § 3B1.1(a).

#### 2. Applicable Sentencing Guideline for Vidro's Murders

Vidro asserts that the district court erroneously applied the first degree murder guideline, U.S.S.G. § 2A1.1, to her convictions for the Council murder and the triple homicide of Valedon, Calo and Villafane. In particular, Vidro argues that the evidence does not show she willfully, deliberately, maliciously, and with premeditation, killed these persons as required under the federal definition of first degree murder. She therefore contends that the court should have departed downward and applied the second degree murder guideline, U.S.S.G. § 2A1.2, to her murders. Vidro also claims that she should not have been held accountable for murders committed by other Latin Kings because such murders were not reasonably foreseeable by her. Further, Vidro argues that even if they were reasonably foreseeable, such acts were not in furtherance of criminal

---

16. New York Penal Law § 125.25 provided, as does Conn. Gen.Stat. § 53a–54a, that "[a] person is guilty of murder in the second de-

gree when ... [w]ith intent to cause the death of another person, he causes the death of such person or a third person."

activity as required by U.S.S.G. § 1B1.3(a)(1)(B) and *United States v. Martinez*, 16 F.3d 202 (7th Cir.1994), a case involving the felony-murder doctrine. Instead, she asserts that her liability for felony murder should be confined to deaths that occurred during the course of the underlying felony. These contentions are entirely without merit.

We review this sentence for clear error and find none here. First, as noted above, Vidro was responsible for the Council murder and the triple homicide under the *Pinkerton* doctrine, in violation of Conn. Gen.Stat. §§ 53a–8, 53a–54a. Because her underlying conduct—that is, the four murders—violated state laws that are most analogous to federal first degree murder, we find that the district court correctly applied the first degree murder guideline to her murders. *See* U.S.S.G. §§ 2E1.1 (RICO), Commentary, Application Note 2, 2E1.3 (VICAR), Commentary, Application Note 1.

Second, Vidro's reliance on *Martinez* is misplaced. The example provided in *Martinez*, which supports the proposition of confining felony murder liability to deaths that occur during the course of a felony, states that "[i]f your confederate, with whom you had agreed to rob one store, robs a second store and someone dies in the course of that robbery, you are not guilty of felony murder even if the second robbery was foreseeable." *Martinez*, 16 F.3d at 208. Vidro's case is factually distinguishable. As noted above, Vidro conspired with Flynn and other Latin King members to kill Reyes, and during the course of that felonious plan, Council was murdered by Flynn. Thus, Vidro is liable for the Council murder because it was done by confederate Flynn in the course of, and in furtherance of, the conspiracy to kill Reyes. Further, when Vidro ordered the murder of Reyes and confederates Zapata and Burgos supplied Flynn and other Latin King soldiers with guns to shoot up a street in New Haven and kill Reyes, it was certainly foreseeable to Vidro that someone other than Reyes would be murdered. Likewise, Vidro is liable because the murders of Calo and Villafane because the record clearly demonstrates that when Vidro ordered confederates Zapata and Hernandez to kill Valedon, it was reasonably foreseeable that in the course of, and in furtherance of, the conspiracy to murder Valedon, others beside Valedon might be killed.

### 3. Challenge to the Drug Quantity Calculation

Vidro was charged with participating in the Latin Kings' drug conspiracy. The PSR determined that she was responsible for distributing 5 kilograms of cocaine from her Clay Street residence in New Haven from December 1991 to April 1992 and 10 kilograms of "pink cocaine" from her Pine Street residence in New Haven from May 1992 until her arrest in October 1992. Co-conspirators' testimony confirmed that Vidro distributed cocaine from these two residences and drug seizures from her residences supported such testimony. A search of her Clay Street residence resulted in the seizure of drugs from a co-conspirator at the premises and in the discovery of one ounce of cocaine within her house. The district court found that Vidro was accountable for 15 kilograms of cocaine and thereby sentenced her to life on the drug conspiracy charge.

Vidro argues that there was insufficient evidence for the district court to hold her accountable for 15 kilograms of cocaine. Specifically, Vidro asserts, without agreeing she possessed or distributed cocaine, that she should be held accountable for at most the one ounce of cocaine found at her Clay Street residence. Vidro further contends that the drug quantity calculation should not include amounts distributed by her co-conspirators either before she joined or after she left the conspiracy. These arguments are frivolous.

First, co-conspirators testified that the amounts distributed by Vidro far exceeded the drug quantity seized from her Clay

Street residence and that such amounts were well over 15 kilograms. Second, Vidro's PSR makes clear that the amount attributable to her was limited to the cocaine distributed at the Clay and Pine Street operations during the time she directed them. Accordingly, we find that there was sufficient evidence that Vidro was responsible for 15 kilograms of cocaine, and therefore, the district court correctly sentenced her to life on the drug conspiracy count.

### G. Zapata's Claims

Zapata argues that his life sentence on the drug conspiracy count should be vacated and remanded for resentencing because the district court did not state its reasons for imposing such sentence as required by 18 U.S.C. § 3553(c)(1). This argument lacks merit.

When the Guidelines range "exceeds 24 months," § 3553(c)(1) requires the district court to state its "reason for imposing a sentence at a particular point within the range." Because Zapata's Guidelines range for a base offense level of 43 mandated "life" imprisonment, there was no applicable "range" and therefore § 3553(c)(1) does not apply. Further, the court explained in detail its reasons for its life sentence on the drug conspiracy count. Accordingly, we find the court's sentencing of Zapata to life on the drug conspiracy count was proper.

### CONCLUSION

We have considered defendants-appellants' other arguments and find them to be without merit. For the reasons presented above, the district court is affirmed in all respects.